**ANDERSON v. AKERS et al.**

No. 649.

District Court, W. D. Kentucky.

July 27, 1934.

Locke, Locke, Stroud & Randolph, of Dallas, Tex., and Peter, Lee, Tabb, Kreiger & Heyburn, of Louisville, Ky., for plaintiff.

Henry E. McElwain, Jr., Thomas A. Barker, John C. Doolan, William W. Crawford, Allen P. Dodd, A. C. Van Winkle, Graddy Cary, Henry J. Tilford, H. H. Nettelroth, John J. Davis, Hugh B. Fleece, J. Wheeler Campbell, T. Kennedy Helm, and Churchill Humphrey, all of Louisville, Ky., for defendants.

TUTTLE, District Judge.

This is a suit in equity brought by the plaintiff, A. M. Anderson, as receiver, appointed by the Comptroller of the Currency under the National Banking Act, of the National Bank of Kentucky, an insolvent national bank, against directors of the said bank, to recover damages claimed by the plaintiff to have been sustained by such bank as a result of the alleged failure of the defendants to properly perform their duties as such directors. The defendants, some of whom are the legal representatives of deceased directors, as indicated, are John S. Akers, Henry J. Angermeier, Peter L. Atherton, administrator of the estate of John M. Atherton, deceased, Dr. Oscar E. Bloch, Charles H. Bohmer, James B. Brown, R. Lee Callahan, Anthony J. Carroll, George M. Clark, Samuel W. Coons, William W. Crawford, Allen P. Dodd, Stuart E. Duncan, Joseph H. Durham, James Garnett, Angereau Gray, James J. Hayes, T. Kennedy Helm, Baylor O. Hickman, Clarence G. Hieatt, Allen R. Hite, Charles F. Jones, Saunders P. Jones, Walter I. Kohn, S. Clay Lyons, Charles C. Mengel, Thomas J. Minary, Edward J. O'Brien, Jr., Henry D. Ormsby, Louisville Trust Company, executor of the estate of John B. Pirtle, deceased, Huston Quin, Richard S. Reynolds, Rosalie W. Rutledge, administratrix of the estate of Arthur M. Rutledge, deceased, William S. Speed, John Stites, Henry Vogt, John H. Wilkes, Fidelity & Columbia Trust Company, ex-

928

ecutor of the estate of Edwin M. Drummond, deceased, Louisville Trust Company, administrator of the estate of George L. Everbach, deceased, Churchill Humphrey, executor of the estate of Alexander P. Humphrey, deceased, Louisville Trust Company, executor of the estate of Milburn P. Kelley, deceased, Liberty Bank & Trust Company, administrator of the estate of Brainard Lemon, deceased, Louisville Trust Company, executor of the estate of William Short, deceased, Fidelity & Columbia Trust Company, receiver of said Louisville Trust Company, and the estate of Anthony V. Thompson, deceased.

The cause was referred to a special master, who, after extensive hearings, at which more than one hundred witnesses testified, decided and reported, in a report of several hundred printed pages, that the defendants who were both officers and directors of the bank, namely, Brown, the president, Jones, the cashier (and, in 1930, a vice president), and Akers, Angermeier, Hayes, and Ormsby, vice presidents, were liable for damages in the aggregate sum of $6,476,992.92, and that certain of the defendants who were directors, but not officers, of such bank were liable in various sums, respectively, aggregating in amount $517,910; such directors being Carroll, Callahan, Speed, Vogt, Minary, Coons, Clark, Durham, Mengel, S. Jones, O'Brien, Hickman, and Duncan. To this report the plaintiff and the defendant nonofficer directors, but not the officer directors, filed exceptions, and the cause is now before this court on such exceptions, on the record, consisting of about seven thousand printed pages and several hundred exhibits, and on exhaustive briefs and oral arguments.

The plaintiff contends that the defendants are liable herein both by reason of their violation of various provisions of the National Banking Act, as hereinafter mentioned, and also because they failed to exercise the reasonable care required by the common law of directors of a national bank, and thereby became guilty of negligence, and that such violation of the banking statutes and such negligence caused damages to this bank in a substantial amount.

The statutory provisions involved will be mentioned and discussed in connection with the various transactions with respect to which such provisions are claimed to have been so violated.

■ It is, of course, a well-settled general rule that, even in the absence of a statute to that effect, the directors of a national bank, as well as of any other bank, are bound to exercise, in the performance of their duties as such directors, reasonable° care, that is, the degree of care which a reasonably prudent director of such a bank would exercise in the performance of such duties, and that failure to exercise such care constitutes negligence, resulting in liability to such bank or its receiver for any damages caused by such negligence. Briggs v. Spaulding, 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662; Bowerman v. Hamner, 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113; Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388.

The question, however, as to whether, in a particular case, a bank director has used reasonable care, or, stated otherwise, whether such director has been guilty of negligence, is not always easy to determine, and in the present case the determination of that question, with respect to the numerous defendants and in relation to the multitude, magnitude, and complexity of the facts and circumstances presented, is fraught with difficulty. Indeed, the size of the record and the number and extent of the transactions involved are such that a full and complete statement thereof would extend this opinion to undue length, and is unnecessary, and a concise summary of the material facts and of the legal conclusions applicable thereto will be sufficient. It may, however, be helpful to first point out certain general considerations governing the application, to this case, of the various factors entering into the question of negligence in this connection.

■ It must, of course, always be borne in mind that the burden of proof rests upon the plaintiff as to each defendant and as to each of the elements necessary to a recovery of damages by the plaintiff. For example, it cannot be presumed that any of the defendant directors acted dishonestly or carelessly; that any of the loans made by this bank were, when made, or afterwards became, improper; that, because such loans eventually resulted in loss to the bank, they were improvident at the time when they were made; that, because one or more of the officers of the bank were dishonest, other officers thereof also were dishonest; or that, because such an officer was dishonest, his associates knew of such dishonesty.

As to these matters, as well as to all others involved herein, the plaintiff has the burden of proof. While elementary, yet, especially at this time when the sympathy of all is with the unfortunate depositors represented by the plaintiff receiver, these fundamen-

tal rules of law, as well as others to be now mentioned, seem to need restatement and emphasis, even at the risk of being considered as unnecessarily repeated platitudes.

Nor can it be presumed that, merely because a loan was poor at the time when it was made, it follows that a reasonably prudent director would have discovered it. Such a banker, though constantly acting with reasonable care and caution, is almost inevitably bound to approve some loans which will prove to be uncollectible. So that, even if it be established by a fair preponderance of the evidence that the indebtedness of a certain debtor to the bank on a particular loan was, in fact, when made, or thereafter became, a bad debt, which caused damage to the bank, yet before any defendant may be held liable therefor it must be proved that such defendant failed to perform a statutory duty or failed to act as a reasonably prudent director would have acted and that such failure was the cause of such damage.

It must also be kept in mind that these acts and transactions are now being viewed in retrospect. It is easy to look back at the road which has been traveled and to see where the mistake was made in making the wrong turn and in leaving the highway which led to the proper destination. It is quite a different matter to place one's self in the driver's seat on the dark night in the past and to determine whether or not a reasonably prudent driver would have then correctly read and interpreted the signposts along the way. I do not doubt that this very danger has led judges and jurors to decisions which worked an injustice to defendants. It is only to the extent that we can, and do, now view past acts in the light which was available at the time of such acts, that justice can be done, in accordance with law. It is so easy to look into the past, and it can be done so accurately, that those who write its records are called historians and are highly respected. It is so difficult to foretell the future that one who attempts to do so is called a fortune teller and, if he charges compensation for his effort, is branded as a criminal. This analogy is more applicable to negligence as applied to loans and investments than to negligence which relates only to physical actions, such as the driving of an automobile. The worth of investments, such as the making of loans, is necessarily largely dependent on the future, and there are involved not only the changes arising from changes in general conditions throughout the country, but also the individual unforeseen misfortunes which come to the particular

debtors and security in question. It is therefore highly important that in such a case as is presented here the court should make every possible effort to avoid the mistake of measuring the quality of care exercised before the event by knowledge gained only after such event.

Another difficult duty of a court in this connection is to properly set up for itself this theoretical imaginary "reasonably prudent person" whom the law has adopted as the standard or model in determining the question of negligence. Having succeeded in making the settings for the picture and having drawn the highways, the branching roads, the signposts with their legends—some clearly written and some quite illegible—we are then required to create a reasonably careful and prudent individual to read and understand the signs and to determine the road which should be taken. To accurately describe this individual is not an easy task. It is customary· for a trial judge to instruct the jury in cases involving negligence that the standard to be applied is the care exercised by the reasonably prudent and careful person, and appellate courts are usually content to follow substantially that language. Now, in my opinion, it is probable that the trier of the facts, in such a case, whether he be judge or juror, thinks, perhaps unconsciously, of himself as a reasonably prudent individual. If he be considering a subject with which he is familiar, for example, the operation of an automobile, he decides what he would do or refrain from doing under the circumstances presented. If he be a very careful and cautious driver, he is likely to place the standard too high. If he happens to be a careless driver, he places the standard too low. It seems to me that this reasonably prudent person is just the ordinary individual who deals with the particular subject under consideration while he is acting as he ordinarily does act. Thus, if the operation of an automobile be the subject involved, it would seem that the reasonably prudent driver of an automobile would be the ordinary person who drives an automobile, and that if, as here, we are considering bank directors, the ordinary bank director, that is, the person who ordinarily acts as such a director, is the standard of comparison to be used as the criterion by which the requisite care must be measured and determined, and, unless the court keeps that in mind, in such a case as that at bar, there is danger that the court may impose upon the defendants a greater duty than is required by the applicable rule of law. The natural

impulse of the judge trying such a case is to expect and demand a high degree of care on the part of such a bank director and to believe that the ordinary bank director is, as the judge is likely to conceive that he himself would be (and perhaps in fact would be), a very careful, conservative, prudent director. It is only natural for a judge to think of himself as a bank director of this ultraconservative type, rather than as a director of the average, ordinary type. He may forget that membership on a board of directors of a large city bank such as is involved here is usually and normally only one of many business activities in which such director is engaged. It may be thought that such a directorship is of sufficient importance to demand that the director give to it all of his thought, energy, and time, but that this is not the usual or ordinary practice is a fact of such general knowledge that the court must take judicial notice of it. It is commonly known that the ordinary director of such a bank devotes only a part of his time to the affairs of such bank and necessarily relies largely on the honesty, judgment, and efficiency of the executive officers to whom the administration of the details of operation of the bank are intrusted. It is well known that many men of ability, character, and business experience and connections are considered to be, and often are, valuable as members of the board of directors of a bank even though they are' not able to give a large amount of time to its affairs. There are often, if not usually, other directors who may not have so much ability or experience, but who are able to devote more time to the bank, so that, while the time which they do give may not be so valuable as others', they may compensate for that by the greater amount of time given. Then there are the officer directors, who are paid for their services and who make the work of the bank their regular occupation and are, as they are expected and assumed to be, much more familiar with the details of the various loans and affairs of the bank than the nonofficer directors ordinarily are or can be expected to be. So that, although a court is, of course, anxious to require as high a standard as is possible with respect to the care to be demanded of every person holding the responsible and important position of bank director, yet it must not lose sight of the legal rule of reasonable care thus applicable nor of the facts and conditions which, in actual practice, do in fact constitute the background and situation of the ordinary, that is, the ordinarily prudent

director of a large and busy bank in a great city, such as is under consideration here, who, and not the ideal director or the kind of director which the court would wish, must be accepted by the court as the standard of comparison in determining whether the defendants exercised the degree of care which such ordinary director would have exercised. On the other hand, the court must recognize that the most prudent man is sometimes negligent and that therefore the ordinarily careful and prudent man may be at times careless and legally negligent. This ordinarily or reasonably prudent man cannot have any periods when he falls below this prescribed standard. In other words, the law having fixed that standard, the court must apply it to the particular transactions involved, and if, in connection with these transactions, the person in question falls below that standard, he is guilty of, and liable for, negligence, even if usually, or at all other times, he acts with proper care.

The general observations just made, which seem to me to be unquestionably sound on principle, are amply supported by applicable authority. Thus the pertinent principles were stated and discussed by the United States Supreme Court in Briggs v. Spaulding, 141 U. S. 132, at page 147 et seq., 11 S. Ct. 924, 929, 35 L. Ed. 662, as follows:

"It is perhaps unnecessary to attempt to define with precision the degree of care and prudence which directors must exercise in the performance of their duties. The degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances. They are not insurers of the fidelity of the agents whom they have appointed, who are not their agents, but the agents of the corporation; and they cannot be held responsible for losses resulting from the wrongful acts or omissions of other directors or agents, unless the loss is a consequence of their own neglect of duty, either for failure to supervise the business with attention, or in neglecting to use proper care in the appointment of agents. * * * In any view the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is therefore ultimately a question of fact, to

be determined under all the circumstances. ᵃ * * * Their conduct is to be judged not by the event, but by the circumstances under which they acted. * * * Certainly it cannot be laid down as a rule that there is an invariable presumption of rascality as to one's agents in business transactions, and that the degree of watchfulness must be proportioned to that presumption. * * * Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank, and that this includes something more than officiating as figure-heads. They are entitled under the law to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention."

In Wheeler v. Aiken County Loan & Savings Bank (C. C.) 75 F. 781, at page 784, it was said:

"The law has not defined, and, in the nature of things, cannot define rigidly, the rules and conditions under which banks may lend money. In such business much depends upon trust,—upon reliance upon character, and business integrity, thrift, and capacity, which may often justify the prudence of a transaction which to lawyers, seeking to apply hard and fast rules, might seem indefensible and reckless. The customs and methods of the community in which the business is done are, for such community, a standard of prudence and diligence by which the responsibility of bank officers and directors is to be tested; and if there is ground to believe that there has been a reasonable conformity to such methods and customs, and absolute good faith and honesty of purpose, it would be unjust to hold to a personal accountability for loans which subsequent events proved unwise."

In Cory Mann George Corporation v. Old, 23 F.(2d) 803, at page 807, the Circuit Court of Appeals for the Fourth circuit stated and applied the rule as follows:

"Directors are not insurers, nor are they technically trustees. They are agents of the corporation, charged with the supervision of its business, and, as such, bound to use that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. * * * We do not think that the directors were guilty of negligence because they did not foresee that what would ordinarily be a sufficient safeguard would be circumvented by the collusion between their faithless cashier and the faithless manager of complainants. As said by Judge Wallace in Warner v. Penoyer (C. C. A. 2) 91 F. 587, 44 L. R. A. 761: 'They are not to be deemed remiss because they did not resort to exceptional methods, or because they relied on the cashier's supervision over the books and accounts, or because they reposed confidence in his reports of the amount and other clerical details of the assets and liabilities. They were under no duty to observe the extraordinary vigilance short of which a bank cannot be protected from the crimes conceived by a dishonest cashier.' "

In Bates v. Dresser, 251 U. S. 524, at page 529, 40 S. Ct. 247, 249, 64 L. Ed. 388, the Supreme Court, applying the rule to the facts in that case, said:

"The question of the liability of the directors in this case is the question whether they neglected their duty by accepting the cashier's statement of liabilities and failing to inspect the depositors' ledger. * * * Some animals must have given at least one exhibition of dangerous propensities before the owner can be held. This fraud was a novelty in the way of swindling a bank so far as the knowledge of any experience had reached Cambridge before 1910. We are not prepared to reverse the finding of the master and the Circuit Court of Appeals that the directors should not be held answerable for taking the cashier's statement of liabilities to be as correct as the statement of assets always was. If he had not been negligent without their knowledge it would have been. Their confidence seemed warranted by the semiannual examinations by the Government examiner and they were encouraged in their belief that all was well by the president, whose responsibility, as executive officer; interest, as large stockholder and depositor; and knowledge, from long daily presence in the bank, were greater than theirs."

It remains to apply these principles, as well as the applicable statutory provisions, to the present case.

The method adopted and followed by the defendants in administering the affairs of this bank, the size and character of such bank, and the general situation surrounding the defendants were described by the special master, in his report, in language which I find to be amply supported by the evidence, as follows (pages 2–7, 359, 360, 361):

"A loan committee of four members having control of the matter of lending the bank's money was appointed. Another committee of four members was appointed, this having control of the bank's investments. Very early in the bank's history these committees were consolidated into one committee of eight members, having charge of both loans and investments. All loans of $5,000 and over had to be submitted to the loan committee and receive the approval of at least five members of that committee before the loan could be made. Loans under $5,000 could be made by any one of the vice-presidents without consulting the loan committee, but it was necessary that such loans be submitted to the loan committee at its regular meeting before business hours on the following morning. This committee met twice each day. At the morning session, prior to banking hours, all loans made during the previous day were considered and discussed. At the afternoon meeting, held after business hours, all maturities of the following day were discussed and marked for payment, reduction or renewal. At these meetings also the investments of the bank were fully considered. The purpose of this was to keep each of the eight officers who were on this committee in direct touch with all loans and investments in the bank. The committee was composed of four officers who were directors and four officers who were not directors. Each member of the loan committee was a vice-president of the bank. Neither the president nor the cashier was a member of the loan committee.

"The following section of the report of an examining committee of May 5, 1922, found on page 98–A of the Minute Book of the bank, sets forth the method of doing business in the bank, namely: ⸱

" 'In the matter of loans and discounts, no officer of the bank should feel at liberty to depart from any fixed policy that has been agreed upon, and, when any loan has been considered and refused by the committee having charge of same, all other officers should abide by and observe such decision in the strictest sense. The system now in operation as to loans and discounts is most excellent. Until within the last few months there were two committees having charge of these matters, each consisting of four officers. One of such committees passed on bank loans exclusively, the other passing on all other character of loans. Within the past few months these two committees have been consolidated so that there is now but one committee composed of eight officers having con-

trol of all loans and other investments made by the bank. The thorough manner in which this committee operates is shown by the following statement. A meeting is held each morning prior to banking hours and all loans made during the previous day are considered and discussed; during the day each loan of $5,000 and over is submitted to and must be approved by at least five of the committee; after banking hours each day the full committee meets and goes over the maturities of the following day. At these meetings the investments of the bank are fully considered. The result is that each of the eight officers is in direct touch with the loans and investments.'

"Each loan coming before the loan committee, no matter 'how small or how large, was recorded on a loan sheet, the amount of the loan, the name of the maker, and the security being noted. Previous to each meeting of the directors, the loan sheets for each day of that week were mimeographed, a copy for each member of the board being made, and these were distributed to the members of the board upon assembling at each meeting, each member being furnished with a loan sheet which described each and every loan made during the previous week, and which indicated also the day of the preceding week when each loan was made.

"A book was kept in the bank sometimes described in the record as 'the $20,000 and over book' and sometimes as 'the $50,000 and over book.' This book was constantly kept up to date and there was supposed to be recorded in it, in alphabetical order, the aggregate line of indebtedness held by the bank against any borrower amounting to $20,000 or over, and it was indicated as to each item on the book whether it was a loan made by the bank, or was an acceptance or a note discounted to the bank, and whether secured by collateral. This book was brought into the directors' room on the first meeting in each month and it was the duty of the cashier to read to the directors all loans of $50,000 or more appearing thereon. The purpose of this book was to keep the directors in close touch with the large lines held by the bank. *  *  *

"The bank from the beginning was so large that it was necessary to divide it into departments and to place an officer at the head of each department, giving him superintendence and control of all matters within the jurisdiction and scope of that department. These were the discount department, collection department, exchange department, individual bookkeeping department, country

bank department, transit department, paying and receiving department, collateral department, safety vault department, and others.

"About five hundred loans were made each week by the bank so that at each weekly meeting of the board of directors that body had before it for consideration approximately that number of loans.

"There were about two hundred employees in all. By far the greatest number of these were engaged in one way or another in keeping the daily records of the bank. The transactions, of which records were kept, or notations made, averaged about fifty thousand each day.

"Once in each year, as of the first of the year usually, a complete audit of the bank's books was made by Humphrey Robinson & Company, Clearing House Accountants, of Louisville, Kentucky.

"In addition, there was an auditing department in the bank. This department, with an efficient auditor at its head, was authorized to audit all records of the bank. It was the duty of the auditor to make reports of such audits to the cashier of the bank. The auditor had general authority with respect to this matter and might go into any department of the bank at will and make an audit of its books and records. His authority in this respect was by resolution of April 20, 1923, made as complete as that of National Bank Examiners. * * *

"This was a bank of prodigious size situated in a city of three hundred twenty-five thousand inhabitants. It had more country bank customers than all other banks in Louisville combined. On the day it opened it was the largest bank in the South. Its total resources were $52,567,554.51. Its weekly loan list contained on an average the names of about 500 borrowers. It became necessary to divide the bank into departments, placing a manager over each. Two hundred employees worked in the bank and at least one hundred and fifty of these were engaged daily in keeping a record of the bank's business transactions. The active management and conduct of the bank's business was, and had to be, entrusted to officers and agents selected by the directors. Due care did not require that the directors should spend all their time at the bank or that they should actively transact its business. They were not salaried officers. They were only required to use ordinary care in superintending the acts and conduct of the officers and agents whom they had selected and to use ordinary care in the matter of selecting and retaining in their

respective positions such officers and agents, that is, such care as an ordinarily prudent and diligent man would use under similar circumstances. In determining whether they gave the bank such care as an ordinarily careful and prudent man would have given under similar circumstances it seems to me that its size and the extent of its business transactions must be taken into consideration. The performance of impossibilities is not exacted of directors. The law, it is true, is the same as to directors of both large and small banks. However, due care, which is ordinarily the standard of conduct for directors, varies with the circumstances.

"Furthermore, it must be recognized that the circumstances surrounding unsuspecting directors where an active effort to deceive them is being made are very different from the circumstances surrounding directors when the officers are not trying to deceive. One is much more likely to be misled as to the facts with respect to a given matter important in connection with a bank's affairs when a concerted effort is being made by officers within the bank to conceal the true facts, hide suspicious circumstances, and to cover up questionable indicia, than is the case when no effort is being made to conceal or mislead. * * *

"They had implicit confidence in Brown and the other officers. The record is full of indications that they implicitly trusted the bank's organization and were proud of it. Evidently they were honest. They were unusually regular in attendance upon board meetings and in this I think the evidence indicates that they were more interested than the ordinary bank director. They trusted Brown and the other officers just as the public generally in Louisville trusted them."

The special master based his ultimate findings of fact, to the effect that negligence on the part of the defendant nonofficer directors had not been established, except in a few instances, largely upon his preliminary finding that defendant Brown, the president of the bank, aided by the defendant Jones, the cashier, had, throughout the period of time here involved, deliberately, systematically, and for the purpose of assisting the said Brown to extract substantial sums from the bank and otherwise to further his own interests at the expense of the bank, concealed from the defendant nonofficer directors communications from the Comptroller of the Currency, reports of bank examiners and auditors, circumstances indicating the character of loans and investments of the bank, and other facts which would have apprised

934

such directors concerning the true condition of the bank and of the various loans and investments here involved.

■ In considering these findings of fact of the special master, I am, in my opinion, bound to follow the rule that such findings, upon disputed questions of fact involving the veracity and credibility of witnesses whose testimony has been heard, and whose demeanor in so testifying has been observed, by the master, should not be set aside by the court unless wholly unsupported by any substantial evidence or unless clearly and convincingly opposed to the overwhelming weight of the evidence. Federal Equity Rule 61½ (28 USCA § 723) includes the following provision:

"In all references to a master * * * the report of the master shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed."

In Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 901, 31 L. Ed. 664, the Supreme Court said:

"The conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part."

In Adamson v. Gilliland, 242 U. S. 350, at page 353, 37 S. Ct. 169, 170, 61 L. Ed. 356, the rule was stated as follows:

"So far as the finding of the master or judge who saw the witnesses 'depends upon conflicting testimony or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable.' Davis v. Schwartz, 155 U. S. 631, 636, 15 S. Ct. 237, 39 L. Ed. 289, 291."

In Lake Erie & Western Railroad Co. v. Fremont, 92 F. 721, at page 731, the Circuit Court of Appeals for the Sixth Circuit, speaking through Circuit Judge Taft, used the following language:

"The witnesses came before the master. He * * * had a much better opportunity than the court below or this court to judge of the weight to be accorded to the evidence of each witness. It is a settled rule in the federal courts that, in dealing with exceptions to a master's report, the conclusions of the master, depending upon conflicting testimony, have every reasonable presumption in their favor."

To the same effect are Camden v. Stuart, 144 U. S. 104, 12 S. Ct. 585, 36 L. Ed. 363, Girard Life Insurance, Annuity & Trust Co. v. Cooper, 162 U. S. 529, 16 S. Ct. 879, 40 L. Ed. 1062, and numerous other cases.

The careful examination of the record which I have made makes it clear, except as hereinafter otherwise indicated, that there was substantial evidence in support of the findings of the special master just mentioned, and that, to the extent that such evidence was disputed, there were presented questions as to the relative truthfulness of witnesses with respect to which the opportunity for personal observation enjoyed by the master gave him such superior facilities for discovering the truth that this court would not be warranted in disturbing such findings.

The various transactions involved will be discussed and disposed of in the order in which they were passed upon by the special master in his report.

Kentucky Wagon Manufacturing Company.

■ For several years prior to 1924 the bank had from time to time made loans in substantial amounts to the Kentucky Wagon Manufacturing Company, a Kentucky corporation engaged, in the city of Louisville, in the manufacture and sale of wagons and other vehicles, the unpaid balance of such loans in June, 1924, aggregating approximately $500,000; in addition to which the bank had made various loans, aggregating about $300,000, to the National Motors Corporation, a company organized with the financial assistance of the bank in a futile effort to refinance, and thus save, the said wagon company. On June 25, 1924, the said Kentucky Wagon Manufacturing Company was adjudicated a bankrupt. Thereupon the bank, in an endeavor to retrieve the loss which it had sustained in the making of the loans just mentioned, expended the further sum of $361,091 in the purchase, at 25 cents on the dollar, of sufficient claims against the bankrupt to enable the bank to control the disposition of the assets of such bankrupt, and, on July 8, 1924, the bank organized a new corporation with the same name, Kentucky Wagon Manufacturing Company, under the laws of Delaware, for the purpose of acquiring, as the bank shortly afterwards did acquire, through the medium of such new corporation as nominal owner, the business and other assets of the old Kentucky Wagon Manufacturing Company, and of continuing the operation thereof, all with the ob-

ject of thereby ultimately recouping the loss resulting from its loans already mentioned. While it appears that the bank desired, if possible, and made some attempts, to recover the amounts so loaned through a resale of the business and assets thus acquired, it is clear that its ability to effect such a sale was at all times extremely uncertain and that the bank intended in the meantime to operate the new wagon company as a manufacturing enterprise regularly and permanently (at least for an indefinite period) engaged in the manufacture and sale of vehicle products, as a business venture. Notwithstanding continuously and increasingly heavy further losses arising from the operations of this manufacturing business, the bank thereafter continued, without interruption, to carry on such operations up to the closing of the bank on November 16, 1930, during which operations it expended, nominally in the form of notes and permitted overdrafts by the new company but actually in outlays by the bank in the operation of this manufacturing business owned by it, additional sums aggregating more than a million dollars. It is manifest from the record, and I find, that all of the defendants who were directors at the time of the ownership and operation of this wagon business by the bank had knowledge thereof but made no effort to terminate it. Indeed, the special master did not find to the contrary.

Under these circumstances, I cannot avoid the conclusion that the acts of the bank in thus acquiring and carrying on the business of manufacturing and selling vehicles were beyond the scope of its powers as prescribed by the provisions of the National Banking Law and ultra vires. First National Bank v. Converse, 200 U. S. 425, 26 S. Ct. 306, 50 L. Ed. 537; Cockrill v. Abeles, 86 F. 505 (C. C. A. 8); Cooper v. Hill, 94 F. 582 (C. C. A. 8); Williams v. Merchants' National Bank (D. C.) 42 F.(2d) 243; In re Kentucky Wagon Manufacturing Co. (D. C.) 3 F. Supp. 958. The following language of the Supreme Court in the first of the cases just cited, involving a similar situation, is equally applicable here (200 U. S. at page 438, 26 S. Ct. 306, 311, 50 L. Ed. 537):

"As no authority, express or implied, has ever been conferred by the statutes of the United States upon a national bank to engage in or promote a purely speculative business or adventure, * * * it follows that the bank had no power to engage in such business by taking stock or otherwise. The power of a national bank to engage in the character of business which the articles of association of the thresher company manifested, as defined by the supreme court of Minnesota, cannot be inferred to have been possessed by the bank as an incident of securing a present loan of money, or as a means of protecting itself from loss upon a pre-existing indebtedness. To concede that a national bank has ordinarily the right to take stock in another corporation as collateral for a present loan or as a security for a pre-existing debt does not imply that, because a national bank has lent money to a corporation, it may become an organizer and take stock in a new and speculative venture; in other words, do the very thing which the previous decisions of this court have held cannot be done."

In Cooper v. Hill, supra, under circumstances like those presented here, it was said (94 F. at page 585 et seq.):

"When a national bank has lawfully acquired real estate or other property, it may sell that property and convert it into money; and, in order to do so, it may clean it, make reasonable repairs upon it, and put it in presentable condition to attract purchasers, in the same way that an individual of sound judgment and prudence would do if he desired to make a sale of the property. The authority to do these things is one of the incidental powers vested in the corporation. * * * The duty of exercising this power is imposed upon the directors and officers of such a bank, and the authority to determine in the first instance when and to what extent it shall be exercised is necessarily intrusted to their judgment. Moreover, they cannot escape the discharge of this duty. They are bound to consider and decide the question at their peril. It follows that, when they have honestly and carefully considered and decided it, they ought not to suffer because, in the light of subsequent events, which could not be foreseen, it turns out that their decision was unfortunate. * * * It is common knowledge that a mine or a prospect for a mine is much more likely to find a purchaser, and much more likely to realize a fair price, when work is in active progress upon it, than when it is still and desolate. * * * We are of the opinion that an expenditure of this amount may be said to have been properly made in the honest exercise of a discretion vested in them, and that they ought not to be personally liable because the use of this money did not secure the purchaser they sought and expected to obtain. The unfortunate part of this case is that they did not stop here. * * * When

no purchaser was found, they proceeded to expend * * * more in prospecting for paying ore upon property in which none has ever been discovered. It was not only beyond their authority as officers of the bank, but ultra vires of the bank itself, to carry on ordinary mining, manufacturing, or trading business,—much more, to expend its money in such a speculative venture as prospecting for ore where none of value ever had been found. * * * The officers of these banks are bound to know they are charged by the law with the knowledge of the extent and limitations of the powers of the corporations for which they act, and of their own authority as the agents of these corporations. * * * Every agent incurs a personal liability to his principal for losses occasioned by his unauthorized acts under the general law, and the officers of corporations are no exception to the rule. Upon this principle the directors and the other officers of a national bank become personally liable to the bank and its successor in interest, its receiver, for losses caused by their use of its funds for unauthorized purposes."

■ Applying the controlling principle here, it would probably have been proper for the bank merely to acquire the property of its debtor, the old Kentucky Wagon Manufacturing Company, in satisfaction of its claims against such debtor, and thereupon to expend a reasonable sum in attempting to make an advantageous resale thereof, including such amount as might be necessary to put such property into condition for such resale. But to organize, as it did, a new corporation, of which it became the beneficial owner, for the purpose of not only taking over the business of its debtor, but also of operating such business for an indefinite period, followed by its actual operation thereof for several years, was beyond the powers of the bank, as the defendants were bound, and must be presumed, to know. It is clear that under section 93 of title 12 of the United States Code (12 USCA § 93), formerly section 5239 of the Revised Statutes, providing that, if any of the provisions of the National Banking Law are violated, "every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation," all of the said defendant directors, except the defendants Pirtle and Short, thereby became liable for the damages resulting from these ultra vires acts.

■ The special master found, on evidence fully justifying the finding, which accordingly I must adopt, that two of the aforesaid nonofficer directors, the defendants Pirtle and Short, "were of unsound mind during the entire time they were on the board of directors" of the bank. It would therefore manifestly be unjust and improper to hold these two incompetent directors or their legal representatives liable for the damages resulting from these ultra vires acts of the bank on the ground that they knowingly participated in, or assented to, such acts, when they lacked the mental capacity to understand or realize the true nature of the transactions in question. Under such circumstances it cannot, in my opinion, be said that directors without that understanding or realization of the acts of the bank were guilty of the intentional participation in, or assent to, such acts on which their liability with respect thereto must be based. This conclusion is equally applicable to the question of liability for violation of the other statutes hereinafter considered. The contention of the plaintiff to the contrary cannot be sustained.

■ The liability of the defendants in this connection is not, in my opinion, reduced or affected by the fact that in 1930, shortly prior to the closing of the bank, the bank, at the instance of its parent company, Banco Kentucky Company, which is hereinafter more fully discussed, transferred to Caldwell & Co., a brokerage firm hereinafter further mentioned, its interest in this wagon business, in exchange for 100,000 shares of stock in said Banco Kentucky Company, for the reason that, assuming (without determining) the validity and propriety of such transfer, such stock proved to be without any real value or benefit to the bank and is not shown to have resulted in any reduction of the loss sustained by the bank by reason of these ultra vires acts.

■ The special master, while apparently recognizing the ultra vires character of these acts, thought that various statements of bank examiners in their reports, from time to time, to the Comptroller of the Currency, expressing satisfaction with the course of the bank in this connection, had the effect of relieving the directors from liability for those acts. I am unable to agree with this view. Assuming, as is found by the special master, that these statements of the examiners were brought to the attention of the directors, it seems to me plain that such statements merely represented the views of such examiners as individuals and could not make proper

what was, as a matter of law, ultra vires and therefore unlawful, nor affect the liability of such directors for permitting what they must be deemed to have known was unlawful.

It is therefore unnecessary to determine whether there was common-law negligence on the part of the nonofficer directors in connection with the expenditures just mentioned. The special master found that such directors were not, but that the officer directors were, guilty of such negligence.

Nor is there any occasion to consider the question whether any of the defendants were guilty of negligence with respect to the advances made by the bank to the old Kentucky Wagon Manufacturing Company prior to the said ultra vires acts, for the reason that, as does not appear to be disputed by the plaintiff, a Kentucky statute of limitations (section 2515 of the Kentucky Statutes) bars recovery for such negligence after five years from the date thereof, and these advances occurred more than five years prior to the date of the commencement of this suit, March 30, 1931; and I agree with the special master that the evidence fails to show that any of the defendants were guilty of negligence merely because they failed, within such five years, to cause suit to be brought against other directors of the bank with respect to the advances so made prior to such five-year period.

I reach the conclusion that each of the directors except the said Pirtle and Short, while acting as such directors of the bank, knew of, and assented to, the said ultra vires acts, and they (or their legal representatives) are, therefore, liable herein for the damages resulting from such of those acts as occurred within the period of five years prior to the commencement of this suit and while such defendants, respectively, were serving as such directors. These damages consist of the net outlays made by the bank in its operation of this wagon business within the said period. The special master has found that the sum of $1,211,773.00 represents the total amount of such net outlays, and the presumptive correctness of this finding has not been disproved by any of the parties, and must therefore be accepted as correct. That sum, therefore, together with interest thereon as hereinafter indicated, is the amount recoverable in this connection from the defendant directors serving as such during all of the period mentioned, or the defendant legal representatives of such directors, deceased. The master, however, has made no finding as to what portion of this total loss was incurred during the term of office of the directors serving for only a part of that period, and, as the evidence does not appear to show this with sufficient certainty, I conclude that, if the parties are not able to stipulate in regard thereto, the court must determine, on the settlement of the decree, the amounts recoverable, with interest as aforesaid, from such defendant directors or from the estates of such directors, deceased, except the said Pirtle and Short.

### Wakefield & Co.

From time to time during the period between March 24, 1928, and October 1, 1930, the bank made loans, in substantial amounts, to Wakefield & Co., an investment banking firm in Louisville owned and operated under that name by one Mrs. Latta, and various other loans, nominally to certain employees of such firm, namely, Miss L. I. Harris, stenographer, Mrs. Fannie G. Schweitzer, bookkeeper, and Leo A. Meagher and J. M. Greer, clerks and salesmen, but actually for its accommodation and account, on the total of which loans there was an unpaid balance, at the time of the closing of the bank, amounting, as found by the special master, to $1,-479,000, for which the plaintiff claims that all of the defendants are liable, both on the ground that the making of such loans, by the officer directors, was improvidently and negligently approved by the defendant nonofficer directors, and for the further reason that such loans were so approved with knowledge by such directors that they should be grouped together as a single line of advances to the said Wakefield & Co., and that, when so grouped, they were in excess of the maximum amount prescribed for a single line of such indebtedness by section 84 of title 12 of the United States Code (formerly section 5200 of the United States Revised Statutes), providing, as amended by the Act of February 25, 1927 (44 Stat. page 1229), 12 USCA § 84, and at the time here involved, that "The total obligations to any national banking association of any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund. The term 'obligations' * * * shall include in the case of obligations of a copartnership or association the obligations of the several members thereof." Plaintiff claims that therefore the defendant directors, by permitting these excessive loans to be made, are liable for the resulting loss, under the pro-

visions of section 93 of title 12 of the United States Code (12 USCA § 93), providing that "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter * * * every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

Before determining whether any of the defendant directors knowingly participated in, or assented to, the making of loans in excess of the maximum prescribed by this statute, the question whether any such excessive loans were made must be considered. That question cannot be determined by merely ascertaining to what extent the total loans to a single borrower, made at any time or remaining unpaid at the closing of the bank, exceeded the statutory limit, which, in the case of this bank at the time here involved, was $600,000. Whether any particular loan to a borrower was thus excessive depends upon the question whether, just prior to the time of its making, the amount of the existing obligations of such borrower to the bank was such that the making of this loan either caused the total of such obligations to exceed the statutory maximum, which was not exceeded until such loan was made, or else increased the excessiveness of the total of such obligations, which was already excessive before such loan was made.

In other words, when a receiver takes charge of a national bank, the amount due to it from a certain debtor may be less than the limit fixed by law and yet the officers and directors may be liable for all of that amount so due if, applying the correct rule, it be found that all of such amount was lost through the making of a loan which, at the time when made, was excessive, and conversely. Of course, in determining the amount of the loss and the amount for which officers and directors are liable, it is necessary to deal with subsequent periods, but this is for the purpose of determining the amount of the loss to the bank resulting from an excessive loan. For example, in the case of this bank, with its statutory limit of $600,000, if a debtor first borrowed from it $50,000, and then another $50,000, and continued to increase the amount of his loan by $50,000 from time to time until he owed a total of $550,000 to the bank, none of this would be excessive because the total amount would

be still within the legal maximum. If, however, while owing such $550,000, he came into the bank and increased his loan by $100,000, although the $550,000 originally borrowed, which at the time when the new loan was made was within the statutory limit, would not become an excessive loan, yet the entire additional $100,000 of new money so advanced would be an excessive loan and would continue to be so until it was actually repaid to the bank; so that if, when the receiver took charge of the bank and proceeded to wind up its affairs, he found that this indebtedness of $650,000 had been reduced to $600,000 or less, it could not be successfully contended by the officers or directors that there was no liability on their part for the making of the said excessive loan merely because the entire amount so due did not then exceed the limit. Questions as to the excessive character of the loan and as to the original amount of any such excess must be determined as of the time when such loan is made. If any loan of money by the bank to a debtor at the particular time when it is made causes or increases an excess of the total obligations of such debtor to the bank beyond the statutory maximum, all of that loan is illegal. Corsicana National Bank v. Johnson, 251 U. S. 68, 87, 40 S. Ct. 82, 64 L. Ed. 141.

Nor are renewal notes of a debtor, even if the amount thereof causes, or increases, a statutory excess in the sum of the total obligations of such debtor, to be considered as excessive obligations, within the meaning of this statute, except to the extent that such renewal notes represent actual outlay by the bank made while the total obligations of such debtor to the bank equaled or exceeded the statutory maximum. McRoberts v. Spaulding (D. C.) 32 F.(2d) 315; Payne v. Ostrus, 50 F.(2d) 1039, 77 A. L. R. 531 (C. C. A. 8).

For the loss sustained by the bank from the making of an excessive loan, the defendant directors of the bank knowingly participating in, or assenting to, such loan, and only they are liable herein.

The special master found that all of these loans were secured, when made, by proper and sufficient collateral; that, because the defendant Brown was using Wakefield & Co. as a means of obtaining the proceeds of these loans for his own personal benefit, he fraudulently caused to be concealed, from the non-officer directors, reports of bank examiners, letters from the Comptroller of the Currency, and other information which would have dis-

closed the character of such loans as loans to Wakefield & Co. in excess of the statutory limit; that such directors did not have such information, had no reason to doubt the propriety of such loans, and, in approving them, relied on the officers of the bank to whom they had intrusted the administration of the details of its affairs; that such directors were not guilty of negligence in connection with such loans; and that, although the defendant officers were liable for the loss resulting from the making of these loans because they knew that such loans should be grouped together as Wakefield & Co. loans and, when so grouped, were in excess of the said statutory limit, yet the other defendants, being without that knowledge, were not so liable. Except as hereinafter pointed out, I am satisfied by the record that the findings of the master just mentioned are supported by substantial evidence and that the court would not be warranted in setting such findings aside. The nature and basis of these findings are indicated by the following quotations from the master's report (pages 84–88), which I adopt:

"Of course, a bank president who has deliberately made up his mind to use the bank's funds in his personal business and speculations must think out a plan or scheme by which he imagines he can safely do this. * * * Brown clearly determined to use Wakefield & Co. in his scheme for making personal use of the bank's money. * * * It is perfectly apparent that Brown and Jones, without protest from any member of the loan committee, were designedly omitting to read parts of the reports of the examiners, concealing letters from the Comptroller, fraudulently evading the demands of that office, and continuously misleading the nonofficer directors. The covering up which Brown and Jones were guilty of, and their acts of concealment in the presence, and with the acquiescence, of the other officers while the board of directors was in session, strongly indicates collusion between these parties, the purpose of which was to enable Brown, without the knowledge of the nonofficer directors, to successfully extract funds from the bank in the name of Wakefield & Co., or its employees. * * * It is claimed that certain letters addressed by the Comptroller to the directors furnished actual notice to the members of the board of the fact that debts of Latta, Greer, Harris, Schweitzer, and Meagher were to be included with the debts of Wakefield & Co., and that there was consequently an excessive loan to that company. I do not think that any of these letters reached the board of directors notwithstanding the recitation in the minutes to that effect. * * * It is satisfactorily established that the minutes, after being read to the board, were fraudulently altered so as to show the presentation and consideration of these letters. The concealment of these letters from the board, and the fact that such questionable, not to say dangerous, means were resorted to to accomplish it, demonstrates the character of the collusion with which the directors were unknowingly surrounded. * * * There was ample motive for withholding the letters from the board of directors. The great weight of the proof is that they were withheld, and the alteration of the minute book, clearly established, is really a potent circumstance to prove that the letters were in fact withheld. The fabrication of evidence to show that they were presented to the board shows they were withheld. It seems to me that there was a concerted plan to do this because Brown and Jones did it successfully in the presence of others who knew and at the same time allowed it to be done without protest. Also this alteration in aid of the concealment of the letters from the board fits in with the claim that Brown did not read to the board any part of the bank examiners' reports reflecting on this indebtedness or in fact criticizing any other loan which he desired to conceal. Going back to the reading of the examiners' reports by Brown to the board, it will be remembered that these reports were made in duplicate; one copy being furnished to the bank and the other to the Comptroller. Difficulty was encountered after the bank closed in finding or getting together the bank's copies. Some of them were found in Mr. Jones' safe, as were also the letters above referred to. Some of the reports had been taken apart and sheets removed. The defendants, after a time, secured certified copies of all reports from the Comptroller's office. Comparing those with the bank's copies of reports, it was found, and is established in the record, that the missing sheets in the bank's copies related to loans which had been severely criticized by the examiner."

▆ I am, however, unable to agree with the conclusions of the special master with respect to a matter now to be considered.

The report of examination of the bank, by National Bank Examiner Sailor, as of April 23, 1927, under the caption, "Loans Exceeding the Limit Prescribed by Section 5200 of the Revised Statutes," designated as "Excessive Loans" the following loans: "Wakefield

940

& Company, $75,000; J. M. Greer, $300,000; L. I. Harris, $300,000; Leo A. Meagher, $300,000; total, $975,000—" and then proceeded as follows:

"This is an excessive loan set up against Wakefield and Company. The three individuals whose loans are included are employees of Wakefield & Company, a brokerage firm. The proceeds of the three loans were credited to the account of Wakefield & Company on the books of the bank, and the interest on the loans was paid by Wakefield & Company at each of the quarterly interest paying periods, that is, 9-30-26, 12-31-26, and 3-21-27. All of these facts tend to show that the loans are nothing more than accommodation loans for the firm of Wakefield & Company and thereby constitute an excessive line of credit to that firm."

Under date of June 30, 1927, the Deputy Comptroller of the Currency sent to the bank a letter addressed "To the Board of Directors of the National Bank of Kentucky," referring to the said report, and including the following statement thereon:

"It is evident from the statement of the examiner on page 5 that the loans of the individuals included in this line were for the accommodation of Wakefield & Company, and should, therefore, be included with the direct liability, and the line reduced to the 10 per cent limit."

On September 7, 1927, the Deputy Comptroller sent to the bank a letter addressed to the board of directors and containing the following language:

"Referring to the report of the last examination of your bank and to previous correspondence in regard thereto, please advise, over the signature of the available directors, whether the excessive loans have been reduced to the legal limit."

On September 16, 1927, the defendant Jones, cashier of the bank, prepared and presented, to each of the defendants Akers, Angermeier, Callahan, Carroll, Clark, Duncan, Durham, Hayes, Hickman, Lemon, Ormsby, and Vogt, separately, and at his office or home (although a meeting of said board was held that same day, at which the letter was not mentioned), for his signature, the following letter, addressed to the Deputy Comptroller and signed by the defendant Brown as president of the bank:

"We beg to acknowledge receipt of your office letter under date of September 7, 1927, with reference to your last examination of this bank and to previous correspondence in regard thereto.

"Wish to advise that loans listed by your examiner as excessive of the legal limit have been reduced as follows:

| | |
|---|---|
| Kentucky Jockey Club ........ | $530,200.00 |
| Reduced by payment to ....... | 469,200.00 |
| Consolidated Realty Company.. | $478,400.00 |
| C. C. Hieatt ................. | 413,610.00 |
| H. J. Scheirich, C. C. and | |
| G. Y. Hieatt................. | 30,100.83 |
| | $922,110.83 |
| Have been reduced to: | |
| Consolidated Realty Company .. | $435,200.00 |
| C. C. Hieatt ................. | 59,000.00 |
| H. J. Scheirich .............. | 100,000.00 |
| | $594,200.00 |

"The loan of $100,000.00 to H. J. Scheirich is secured by certificate of deposit of this bank for full amount.

"Loans listed under the caption—overdue, slow and doubtful paper have been reduced $1,032,707.81 as per detailed list attached.

"Loans listed under the caption of loans especially mentioned have been reduced $996,797.64 as per itemized list attached.

"Very respectfully yours."

When so presented for signature, this letter did not have attached to it any list of loans. Thereupon, however, each of the said directors, after reading the letter, and without seeing, or making any request or effort to see the "office letter under date of September 7 with reference to" the said examination, or any of the "previous correspondence in regard thereto" thus mentioned, signed this letter of September 16 and handed it back to the defendant Jones.

It is clear that if any of these directors had glanced at the said letter of September 7, which they were thus expressly answering, he would have become fully informed concerning the nature and effect of the Wakefield & Co. indebtedness as in excess of the limit prescribed by the statute in question. It is equally clear, and I find, that the circumstances under which this letter was so presented to these directors were such as to impose upon them, as such directors, the duty to at least look at the letter of the Comptroller which they knew that they thus were answering. Their letter bore the date of the very day on which a meeting of their board had been held.

This letter had not been presented or mentioned, at that meeting, to them or to any of the other directors gathered there, and no explanation of that fact had been made to them. Each of them knew, however, that the cashier had then gone to the pains of seeking him out separately at his own office or home and there, for the first time, presenting this letter and asking his signature thereon. The letter on its face showed that the Comptroller had written a letter to the bank relative to an examination of the bank; that correspondence had been had in regard thereto; that various loans had been listed by the examiner as excessive, overdue, slow, or doubtful; and that a list of such loans was mentioned in such letter as attached thereto, but was not so attached. It was apparent that the subject-matter of this letter was of such importance that the personal signature of these directors was desired. Nothing could be plainer than that under these circumstances each of these directors was, in substance and effect, warned of the necessity of making some investigation or inquiry concerning the nature and subject of the official correspondence in which he was thus participating, at least to the extent of examining the Comptroller's letter to which he was thus replying, and I cannot avoid the conclusion that, when each of the directors mentioned neglected to make any such investigation or inquiry, he "deliberately refrained from investigating that which it was his duty to investigate," and that "any resulting violation of the statute must be regarded as in effect intentional," within the meaning of the applicable statute, as construed by the Supreme Court in Corsicana National Bank v. Johnson, 251 U. S. 68, at page 71, 40 S. Ct. 82, 84, 64 L. Ed. 141, where the Court said:

"Under the rule settled by familiar decisions of this court, in order for the bank to prevail in this action it must appear not only that the liabilities of a person, company, firm, etc., to the bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans, not through mere negligence, but knowingly and in effect intentionally (Yates v. Jones National Bank, 206 U. S. 158, 180, 27 S. Ct. 638, 51 L. Ed. 1002), with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional' (Thomas v. Taylor, 224 U. S. 73, 82, 32 S. Ct. 403, 56 L. Ed. 673)."

The finding of the special master to the contrary was not a determination of facts as to which there was a dispute involving the truthfulness or credibility of witnesses. The facts just mentioned, relative to the presentation and signing of the said letter to the Comptroller, were undisputed and admitted by the directors concerned. The question whether these facts showed such constructive notice to those directors as to render them liable under the statute is, if not a question of law, at least a question which the personal observation of the witnesses by the master gave him no means of deciding more correctly than can the court, and his finding thereon is therefore fully open to review by the court. Edward G. Budd Manufacturing Co. v. C. R. Wilson Body Co., 21 F.(2d) 803, 804 (C. C. A. 6).

As was said by the court in the case just cited:

"These findings are only deductions from other established facts as to which there is no substantial dispute. In such a situation, a master's findings do not carry any great weight. As was said in Ohio Valley Bank v. Mack (6 C. C. A.) 163 F. 155, 24 L. R. A. (N. S.) 184: 'The judge, having the same facts, may as well draw inferences or deduce a conclusion as the referee.' "

As, therefore, each of the Wakefield & Co. notes outstanding at the time of the closing of the bank represented an indebtedness to the bank incurred after these particular directors received, but failed to take any action on, this constructive notice to the effect that the Wakefield & Co. line of loans was in excess of the statutory limit, which was $600,000, it follows, in my opinion, that each of such directors must be held to have assented, in violation of this statute, to such excessive loans, made during his term of office, and is liable herein for the resultant loss to the bank. McRoberts v. Spaulding (D. C.) 32 F.(2d) 315, 320. The following language of the special master in this connection (on page 104 of his report), relative to the amount of the damages sustained by the bank and therefore to be recovered from the defendant officers, is equally applicable to the recovery of such damages from these particular nonofficer directors:

"It is difficult to determine with certainty as to the amount of the decree against said last named defendants. The debts at the suspension of the bank amounted to $1,479,000. All these debts were secured by collateral which went into the hands of the receiver. Some of this has been sold. Much of it was

still in the hands of the receiver at the time the evidence was heard. The market value of the collateral has been constantly declining since the receiver took charge of it. From the best information I can get from the evidence it seems that the decree against the last named defendants should be for at least $1,000,000, the amount sued for in the bill."

I conclude, therefore, that the amount of the damages so recoverable from these directors, under this statute, must, if not stipulated by the parties, be determined at the time of the settlement of the decree herein, by deducting from the said $1,479,000 whatever sums shall then have been realized by the plaintiff from liquidation of the collateral mentioned and by adding to the balance of loss then remaining interest as hereinafter indicated.

### Murray Rubber Company.

At the time of the closing of the bank there was due and unpaid to it from the Murray Rubber Company, a corporation engaged in the manufacture of tires and other rubber products at Trenton, N. J., on various promissory notes, evidencing loans from the bank to the rubber company, the sum of $421,249.-87, as found by the special master. Each of these loans was made in 1928, 1929, or 1930, and at a time when the total of the notes and bonds of the Murray Rubber Company held by the bank equaled or exceeded the statutory maximum of 10 per cent. of the bank's capital and surplus prescribed by section 84 of title 12 of the United States Code already mentioned. The said total of the notes and bonds of the rubber company included, until April, 1929, $330,000 in principal amount of a series of 20-year first mortgage bonds of the said company, acquired by the bank in 1922 under circumstances hereinafter described, being part of a total issue of $750,000 in principal of such bonds. On April 1, 1929, the bank surrendered said bonds and also canceled $250,000 of notes of the rubber company in exchange for a new three-year note of said company. This exchange, however, was a mere matter of form, and does not affect the substance of the situation now to be discussed.

It is urged, by the defendants, and was held by the master, that these bonds constituted, as they were designated on its books, an investment of the bank, and that therefore the obligations of the rubber company represented by such bonds should not be treated as "obligations" of the company within the meaning of this statute, for the purpose of determining whether the total of such obliga-

tions exceeded the statutory limit thereby prescribed. If these bonds should be so excluded from consideration, the unpaid loans now in question were not made at a time when the statutory maximum of the obligations of the rubber company to the bank had been reached. It is therefore necessary to determine whether these bonds constituted investments of the bank which are not to be considered as obligations of the obligor therein in applying this statute.

I reach the conclusion that the contention of the defendants in this connection cannot be sustained. Even if the bonds were a proper "investment" of the bank, it would by no means follow that they would not also be "obligations" of their obligor, in view of the broad and all-inclusive language of the statute, which does not include such investments among the several classes of obligations therein specifically exempted from the operation of the statute. The word "investment" is a general term and applies to all of the various things into which a bank puts its money. There is nothing in the law which permits a bank to escape the limitations of this statute by creating a new and different account to be known as an investment account. Not only is that without justification in the law, but it would defeat the very purpose of this statute. The limit of 10 per cent. of the unimpaired capital stock and surplus of the bank, as the maximum amount of the obligations of any one individual, copartnership, or private corporation to the bank was for the obvious purpose of preventing the bank from putting too many of its eggs into one basket. The purchase of the bond of a private corporation is as much a loan to that corporation as is the advance of money to such corporation on its ordinary promissory note. To exceed this 10 per cent. limit by taking bonds instead of some other evidence of indebtedness is just as fully in violation of the spirit and intent of the statute as is the making of an excessive loan on promissory notes. Neither can the statute be evaded by dividing the amount of obligations of a debtor between bonds and notes. It is within the power of Congress to limit these obligations in any manner that it may deem proper. Undoubtedly Congress could prescribe a different limit on the power of a national bank to accept the bonds of private corporations than is applicable to promissory notes of such a corporation. If no such difference in classification is established by the statute, but a general classification is made, of course, both bonds and notes of private corporations come with-

in those general limits, and the bank cannot, of its own accord, make a classification of obligations held by it into what it arbitrarily calls investments and in that account place such "investments" which are beyond the statutory limitation on the amount of such obligations, and by that procedure change such obligations into something else. The legality of these "investments" is to be determined, not by the name of the account in which they are kept by the bank nor by the name which it has given to them, but solely in accordance with their true character and with the language of the statute. I conclude, therefore, that this statute applies to these bonds if they are, as they clearly are, in fact and in law obligations of the Murray Rubber Company, by which they were executed and issued, unless their status in this respect is altered by some other applicable statutory provision.

The defendants, however, in this connection invoke the provisions of the Act of Congress of February 25, 1927 (44 Stat. page 1226), amending section 24 of title 12 of the United States Code, formerly section 5136 of the United States Revised Statutes (12 US CA § 24), so as to add thereto the following proviso:

"Provided, That the business of buying and selling investment securities shall thereafter be limited to buying and selling without recourse marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation, in the form of bonds, notes and/or debentures, commonly known as investment securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency, and the total amount of such investment securities of any one obligor or maker held by such association shall at no time exceed 25 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 25 per centum of its unimpaired surplus fund, but this limitation as to total amount shall not apply to obligations of the United States, or general obligations of any State or of any political subdivision thereof, or obligations issued under authority of the Federal Farm Loan Act [chapters 7 and 8 of this title]." Section 2, subd. 7.

The defendants contend that the effect of this statute is to exclude these bonds of the Murray Rubber Company from the operation of the statute prescribing the 10 per cent. maximum already considered.

It will be noted that, under the language of the statute just quoted, the "investment securities" to which it applies consist of "bonds, notes and/or debentures, commonly known as investment securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency." Pursuant to that provision, the Comptroller of the Currency, on June 20, 1927, promulgated the following regulation:

"An obligation of indebtedness which may be bought and sold by national banks, in order to come within the classification of 'investment securities' within the meaning of the proviso of section 5136 above quoted, must be a marketable security as designated by the express language of said proviso. Under ordinary circumstances the term 'marketable' means that the security in question has such a market as to render sales at intrinsic values readily possible. In classifying a given security as marketable, the Comptroller of the Currency may in specific cases give consideration to various facts and circumstances, but he will require in all cases the following: (a) That the issue be of a sufficiently large total to make marketability possible; (b) Such a public distribution of the securities must have been provided for or made in a manner to protect or insure the marketability of the issue. (c) That the trust agreement under which the security is issued provides for a trustee independent of the obligor and in the case of securities issued under a trust agreement executed and delivered after sixty days from the date of the promulgation of these regulations, such a trustee must be a bank or trust company."

Although the record fails to show the existence of this regulation, the court takes judicial notice thereof. Caha v. United States, 152 U. S. 211, 14 S. Ct. 513, 38 L. Ed. 415. As was said by the Supreme Court in the case just cited (152 U. S. at page 221, 14 S. Ct. 513, 517, 38 L. Ed. 415):

"We are of opinion that there was no necessity for a formal introduction in evidence of such rules and regulations. They are matters of which courts of the United States take judicial notice. Questions of a kindred nature have been frequently presented, and it may be laid down as a general rule, deducible from the cases, that wherever, by the express language of any act of congress, power is intrusted to either of the principal departments of government to prescribe rules and regulations for the transaction of business in which the public is interested, and in respect to which they have a right to participate, and by which they are to be controlled,

the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice."

■ Applying this definitory regulation to the bonds in question, there is no evidence to indicate that such bonds ever had "such a market as to render sales at intrinsic values readily possible" or that "such a public distribution" thereof was at any time "provided for or made in a manner to protect or insure the marketability of the issue." On the contrary, the undisputed evidence shows that these bonds were issued by the Murray Rubber Company and delivered, together with 500 shares of its preferred stock, to the bank in exchange for (a) a discharge by the bank of certain debts, aggregating about $250,000, owed to the bank, in approximately equal amounts, by the Rubber Corporation of America and the receivers for the Empire Tire & Rubber Company, affiliated predecessors of the Murray Rubber Company; and (b) further advances of cash made to it by the bank, the transaction being, in substance and effect, part of a plan, by the bank and by another bank, which received the balance of this issue of bonds, for the reorganization of such predecessors so as to form a new company, the Murray Rubber Company, and to supply it with the necessary initial working capital. Obviously, these bonds were issued by the Murray Rubber Company in order to evidence its indebtedness to these two banks created by their advances just mentioned, and it seems plain that no public distribution of such bonds was made or contemplated. It is apparent that the primary purpose of the bank in this transaction was to recoup the loss which it had sustained from its loans to these two earlier debtors, by substituting for them a new debtor, the Murray Rubber Company, and by assisting the latter to acquire, as it did acquire, the assets of such former debtors, and to make a fresh start in business with the aid of such assets and of the new working capital thus furnished to it, in the hope that the bank might thereby obtain repayment, by the Murray Rubber Company, of its previous advances as well as these further advances. It follows that these bonds must be included among the obligations of the Murray Rubber Company, for the purpose of determining whether its indebtedness here involved, to the bank, exceeded the statutory maximum of 10 per cent. of the capital and surplus of the bank.

■ I am satisfied by the record, and I find that, at the time of the making of each of the loans to the Murray Rubber Company remaining unpaid at the closing of the bank, the total amount of the obligations of such company to the bank, including the amount of these bonds, equaled or exceeded this statutory limit, and that the directors, except the said Pirtle and Short, serving at the time when such loans were made had knowledge of such excessive loans. Indeed, the master found (on page 119 of his report) that "They were never given any information as to the cancellation of the $330,000 of bonds," and (on page 123) that "So far as the directors then (January 1, 1930) knew it (the bank) still held the $330,000 of bonds." These directors, therefore, having approved loans so made in violation of the statute, must be deemed to have knowingly assented to such violation and must be liable accordingly, for the resultant damages, with interest as hereinafter indicated. The considerations hereinbefore mentioned relative to the determination of the exact amount of these damages and the apportionment thereof among the various defendants, either as stipulated between the parties or else as adjudicated on settlement of the decree, are equally applicable here; the basis of such determination and apportionment being the aforesaid sum of $421,249.87, found by the master to be the balance of these loans remaining unpaid at the time of the closing of the bank, such sum to be reduced by the amount thereafter realized by the plaintiff on account thereof.

In view of the conclusions so reached, there is no occasion to consider the question whether, as is asserted by the plaintiff and denied by the defendants, the defendant directors were also guilty of negligence in connection with the making or approval of any of these loans.

### E. B. Norman & Co.

Plaintiff claims that the defendants are liable for losses sustained by the bank as a result of the indebtedness to it of E. B. Norman & Co., a Kentucky corporation having its home office in Louisville, and engaged in the manufacture and sale of lumber products; the balance of such indebtedness remaining unpaid at the time of the close of the bank being $702,861.25 on various notes, $13,491.99 on an overdraft of said company in its commercial account at the bank, and approximately $35,000.00 on notes signed by third persons and indorsed by the lumber company to the bank. This claim of liability is based on the ground that the defendant directors not only were negligent in permitting these

obligations to be incurred, but also knowingly violated the statute, hereinbefore considered, limiting the amount of such obligations to 10 per cent. of the bank's unimpaired capital and surplus; such maximum here being $600,000 at the time in question. The special master ruled against the plaintiff on both of these contentions, holding that neither negligence nor intentional violation of such statute had been established against any of the defendants.

The capital stock of E. B. Norman & Co. was owned principally by members of the Norman family, residents of Louisville, who were well and favorably known there as able experienced lumbermen and who were old customers of the bank. Shortly after its incorporation, the lumber company began borrowing moderate sums from the bank on what appeared, from available information including frequent financial statements furnished by it to the bank, to be sufficient financial responsibility and prospects. In 1924 the company persuaded the bank, by an apparently proper and sufficient showing of probable profit to loan it $100,000 for the purpose of making an initial payment on a contract for the purchase, by it from the Texas Company, of a tract of approximately 15,000 acres of merchantable hardwood timber in Louisiana, containing, according to reports of competent timber cruisers, about 65,000,000 feet of such timber; the purchase price thereof being $438,000, payable in five annual installments. This purchase then seemed, to capable and experienced observers, to be an extremely advantageous deal for the lumber company and to amply warrant the making of this loan.

Unfortunately, however, for the lumber company and for the bank, unforeseen and unavoidable difficulties and troubles soon arose in connection with this purchase. The price of lumber unexpectedly fell. Unlooked for increases in the cost of the cutting, removal, sawing, and transportation of the timber from this tract developed. It soon became necessary for the lumber company to call on the bank for additional advances to enable it to perform its contract for the purchase of said timber, and it seemed to the directors of the bank, in the exercise of their best judgment, under the circumstances then confronting them, that the best interests of the bank demanded that it grant these further loans in order to avoid greater loss through inability of its debtor to consummate this purchase. The situation in which the defendants thus found themselves and the reasons which prompted them to make the subsequent loans here involved, are described by the master in his report (page 145 et seq.) in findings, with which I agree and which I hereby adopt, as follows:

"The bank was confronted with the necessity of either collecting its debt, which by March, 1927, had increased to $266,229, or furnishing additional money to E. B. Norman & Co. with which to continue its operation. * * * The position which the bank occupied almost forced it to see that E. B. Norman & Co. did not fail in this respect. * * *

"What, under these circumstances, would an individual have done with $266,229 already invested, with his debtor in exactly the position that E. B. Norman & Co. occupied at that time, and with the debtor's principal asset in exactly the same situation? The Normans were known as honest people. This was, and always had been, their reputation around Louisville. They were, and had been always, engaged in the lumber business in the South on a large scale. They had had wide experience. All an individual in this position could do would be to exercise his best judgment. It does not seem to me that a decision either way could be said to involve negligence. * * *

"Some time after the bank's indebtedness against E. B. Norman & Co. began to increase, the company, as a matter of additional security to the bank, began to deliver to it invoices for lumber shipped. It seems that these invoices were not formally assigned to the bank, and the company, so the evidence indicates, itself collected for the price of the lumber covered by the invoices, but forwarded the proceeds to the bank. * * *

"The company, also as a matter of additional security to the bank, from time to time gave large notes, executing at the time mortgages on finished lumber stacked on its yards. * * *

"In determining the question as to whether the directors were guilty of negligence in approving the loans in the bank when it closed, and particularly those taken after October, 1929, many things must be considered.

"The balance sheet of the company of January 1, 1930, showed that E. B. Norman & Co. had a net worth at that time of $424,776.59. The various cruises of the timber on the 14,600-acre tract shed some light on the question of negligence because they indicate what the directors must have had in mind as to the quantity of timber shown by these cruises. As late as June 19, 1930, McDaniel, an experienced lumber man of that vicinity, esti-

946

mated the timber still standing on the Texas tract at 40,880,000 feet, furnishing to the bank a written estimate to that effect. During this time valuable timber properties in addition to the Texas tract, largely paid for in lumber, were owned by E. B. Norman & Co. A $50,000 life insurance policy was still being carried. The situation of the bank with reference to the Texas tract was unusual in that it made it necessary for the bank to advance money for operations to the end that this asset might be saved. Other property was held by the debtor in very much the same way. Mr. Akers, a member of the loan committee, had special charge of this matter. The loan committee had credit information and approved all the loans before the directors passed on them. The bank already 'had a large sum loaned to E. B. Norman & Co. The safety of this depended on the decision of the directors with respect to furnishing fresh money. Looking at the whole matter, as it then presented itself to the directors, I would not be willing to say that they were guilty of negligence in approving the loans now complained of.

"Furthermore, the directors, after October, 1929, were acting under the influence growing out of the precipitate fall in market values. It is easy now to see, but difficult at the time the directors acted to foresee, what this portended. It was the duty of the directors to save, if possible, the investment which it already had. I cannot say that they acted with less care than the ordinarily prudent man would have acted under similar circumstances."

■ In rejecting the contention that the defendants violated this statute by making advances to the lumber company in excess of the statutory limit, the master based his conclusion on the grounds that it appeared that a part of the indebtedness exceeding such limit consisted of interest on previously existing indebtedness, that such interest should not be included in computing the amount of indebtedness which was excessive, and that the plaintiff had not shown the amount of such indebtedness exclusive of such interest and therefore had not definitely established a violation of this statute. I am unable to agree with these conclusions of the master.

While it is true that, when obligations mentioned in the statute have reached the maximum thereby prescribed, only the obligations thereafter incurred representing actual outlays by the bank are to be treated as excessive and that interest thereon is not to be included in such subsequent obligations, it seems clear that, in determining whether such limit has been reached (not exceeded), interest due on indebtedness is as much an obligation as is the principal of such indebtedness, and must be so treated in applying this statute.

■ I am satisfied by the evidence, and I find, that from July 11, 1930, continuously to the close of the bank on November 16, 1930, the direct obligations of E. B. Norman & Co. to the bank, on its notes representing outlays of cash to it, exceeded the statutory limit of the bank, and that each of the defendants who was a director during that time, the aforesaid incompetent directors not being one of them, knew of, and approved, the loans constituting such excess obligations which were made while he was such director, and therefore must be held to have thereby knowingly assented to this violation of the statute. The master has not found to the 'contrary. The said defendant nonofficer directors admit, in their brief, that they were conversant with and continually discussed the line of indebtedness of this debtor, although they do deny that it was ever read to them as being in excess of $600,000. As, however, they approved the making of each of the loans just mentioned, they necessarily knew of such making of said loans which together exceeded the statutory limit, so that the mere fact that they did not read, or hear read, as a single figure, the total of such loans does not negative knowledge by them of the fact that obligations of a single debtor in excess of such limit were being permitted in violation of the statute of which they are chargeable with knowledge. The master did find that knowledge by such directors of the said overdraft or of the indebtedness of the lumber company on the aforesaid notes not executed, but merely indorsed, by such company, had not been proved, and I am not prepared on this record to disturb that finding. Nor does it appear, as claimed by plaintiff, that any of these directors had reason to believe that the last-mentioned notes were, if they were (as is not proved), actually the direct, and not the indirect, obligations of the lumber company.

It results that the defendant directors, except the said incompetent directors, are liable for the portion of the direct obligations of E. B. Norman & Co. permitted while they were directors and remaining unpaid at the close of the bank which constituted, when incurred, loans in excess of the statutory maximum of $600,000, within the meaning of this statute, as hereinbefore construed, which

is to be determined and adjusted, by stipulation or on settlement of the decree, as already directed with respect to other losses, and with interest as hereinafter indicated.

### Van Camp Packing Company.

On October 3, 1929, the defendant Brown, acting as president of the bank, purchased for its account, from the aforementioned Wakefield & Co., 11,550 shares of common stock in the Van Camp Packing Company at a price of $22 per share, for which he caused the bank to pay a total price of $254,100. This price was in excess of its then current market value, and the stock was purchased at that price for the purpose, and with the effect, of enabling the said Brown to pocket for himself, as a secret profit, the difference, amounting to approximately $50,000. The master found, and the evidence convincingly shows, that while the defendant Jones, then cashier of the bank, knew of and assisted in this transaction, all knowledge of it was concealed from the nonofficer directors and that none of such directors had any knowledge of the purchase of this stock until it was brought to their attention by National Bank Examiner Wood on May 16, 1930, at which time they immediately directed that such stock be sold or else that any loss sustained by its purchase be charged off. On July 25, 1930, the stock was sold for $4 per share, resulting in a loss to the bank of approximately $208,000. The record clearly justifies the finding of the master that no negligence on the part of any of the nonofficer directors with respect to this transaction has been proved, and I conclude that there is no basis for any liability on their part therefor.

### Loans Secured by Stock in Banco Kentucky Company.

The plaintiff claims that the defendant directors are liable for losses amounting to $1,-733,001.21, arising from the making of several hundred loans by the bank to various borrowers secured, in whole or in part, by collateral consisting of stock in the Banco Kentucky Company, a corporation organized under the laws of Delaware, at the instance of the directors of the bank, for the purpose of acquiring and holding the capital stock of this bank and of other banks, as well as trust companies, and of engaging in commercial transactions some of which were beyond the legal power of such banks and trust companies.

The liability so alleged is based on the claim that the making of such loans on such stock as collateral was not only negligent but also in violation of the following provision of section 83 of title 12 of the United States Code (12 USCA § 83):

"No association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith."

The last-mentioned contention will be considered first.

In 1927, the holders of substantially all of the capital stock of the bank and of the Louisville Trust Company exchanged such stock, on an agreed basis, for trustees' participation shares representing the ownership of the said stock. In July, 1929, the officers and directors of the bank and of the trust company evolved and adopted a plan for what they called the "reorganization" of such bank and trust company, through the organization of a new corporation, under the name of Banco Kentucky Company, which should acquire and hold all, if possible, or at least a majority, of the said trustees' participation shares. This reorganization plan, the reasons therefor, and the purposes thereof were described in the following letter which, on July 19, 1929, three days after the incorporation of the Banco Kentucky Company, was sent by the directors of the bank and of the trust company to all of the holders of the said trustees' participation shares:

"Louisville, Ky., July 19, 1929.

"To the Holders of Trustees' Participation Shares, National Bank of Kentucky and The Louisville Trust Company:

"1. Your Officers and Directors have studied the rapidly changing conditions in the banking business in America, with a view to preparing the two banking institutions under their management, to meet these changed conditions, and to take early advantage of new opportunities presented thereby.

"2. The conclusion unanimously reached, as a result of their deliberations, is that the two banks, and the business conducted by them, should be reorganized by adding to this group a third corporation, which will make the operations of these banking institutions more profitable, expand their facilities, and thus develop for the entire group new and profitable financial opportunities and connections.

"3. Such a reorganization is in line with the trend of business and finance in this country; and the strength and influence of

948

the new corporation will not only greatly benefit the two banks and the territory they now serve, but will also be a stabilizing influence in banking circles throughout this section of the country. The new corporation can exercise many profitable and important functions which neither a bank nor a trust company has authority to exercise, and can take advantage of many sound and profitable financial opportunities, frequently presented in the course of business of the two banks, but not available to them, because of the restrictions upon their powers and activities.

"4. The following is the Plan of Reorganization agreed upon by the Officers and Directors of the two banks, and approved by formal Resolutions of the Trustees, under the Trustees' Agreement for the National Bank of Kentucky and the Louisville Trust Company.

"5. There has been organized under the laws of the State of Delaware, a corporation known as the Banco Kentucky Company, with an authorized capital of 2,000,000 shares, having a par value of Ten ($10.00) Dollars each. The stock will be exchanged or sold, in accordance with this Plan, on the basis of Twenty-five ($25.00) Dollars per share, which will give the Company a capital of Twenty Million ($20,000,000.00) Dollars, and a surplus of Thirty Million ($30,000,000.-00) Dollars, or a total capital and surplus of Fifty Million ($50,000,000.00) Dollars. No stock will be sold by the Company at less than Twenty-five ($25.00) Dollars per share.

"6. The corporation is given broad charter powers, including the right to acquire stocks, bonds and other securities of other corporations, and evidences of indebtedness created or issued by other corporations; the power to underwrite securities and take part in syndicate management, and to charge fees and commissions for its services in connection with the reorganization or refinancing of other corporations; the power to issue bonds and to guarantee the obligations of others and to become surety, guarantor and endorser thereof. The foregoing is merely a brief summary of the broad powers given the corporation; complete details of these powers appear in the Certificate of Incorporation of the Company, copies of which may be examined at the offices of the two banks by any one interested.

"7. It is an essential part of this reorganization that the shares of this corporation (or at least a substantial majority thereof) be owned by the Trustees' Participation Shareholders, and that it be managed and operated by the Boards of Directors and the officers of the two banks. The Banco Kentucky Company, therefore, offers to the Trustees' Participation Shareholders of the National Bank of Kentucky and the Louisville Trust Company, through the Trustees as agents in the transaction, its entire capital stock, on the bases and subject to the terms and conditions hereinafter set out;

"8. It is an essential part of this plan that:

"(a) On or before September 19, 1929, the holders of the Trustees' Participation Shares must deposit their certificates with the Trustees for exchange into the shares of the Banco Kentucky Company; and for each Participation Share thus deposited, the Trustees will cause to be issued to the holder thereof Two (2) shares of the stock of the new corporation. In addition thereto the depositing shareholder will have the right to subscribe for as many additional shares of the stock of the Banco Kentucky Company as he may desire at the price of Twenty-five ($25.-00) Dollars per share subject to allotment ratably if over-subscribed. Trustees' Participation Shareholders who fail to deposit their shares on or before September 19, 1929, will be deemed to have waived their rights to thus exchange their shares and subscribe for stock in the new Company, unless the Trustees shall extend the time for deposit and subscription (as they may do in their discretion), in which event the Trustees' Participation Shareholders will be deemed to have waived their rights, unless their shares are deposited within the extended time.

"(b) The entire Plan of Reorganization and the deposit and subscription privileges and rights hereinabove set out, are all, and each of them is, conditioned expressly upon the acquisition by the Trustees' Participation Shareholders, either by deposit for exchange, or by direct subscription as above, of at least a majority of the shares of the Banco Kentucky Company; and further conditioned upon the acquisition by the Banco Kentucky Company of at least a majority of the Trustees' Participation Shares issued and outstanding as of September 19, 1929.

"9. It is the unanimous recommendation of your Officers, Directors and Trustees of the National Bank of Kentucky and the Louisville Trust Company, that the Trustees' Participation Shareholders immediately deposit their shares under this Reorganization Plan, and that they exercise their right to subscribe to the additional shares of stock of the Banco Kentucky Company.

"10. There is enclosed herewith a subscription form covering this transaction, which you are asked to sign at your earliest opportunity and deposit with the Trustee, at their office, 421 West Market Street, together with your Certificate or Certificates for Trustees' Participation Shares, endorsed in blank and witnessed. There will be issued to you an Interim Receipt for the shares deposited which, when the Plan has become effective as above set forth, may be presented for exchange for the permanent certificates of the Banco Kentucky Company, in accordance with the Plan of Reorganization."

This letter was signed by the presidents and by the directors of the bank and of the trust company, obviously acting as such officers and directors, although these individuals were also serving in the same capacity, respectively, with respect to the newly organized holding company, Banco Kentucky Company, and the defendant directors now advance the contention, which cannot be sustained, that this was the letter of that Company.

Pursuant to this reorganization plan, the Banco Kentucky Company, thus organized, proceeded to acquire trustees' participation shares evidencing ownership of about 90 per cent. of the capital stock of the bank, the value of which shares represented, at the inception of the Banco Kentucky Company, about two-thirds of the value of the entire assets of such company and continuously thereafter represented varying percentages, at no time less than about 40 per cent., of the value of such assets, including stock in other banks and trust companies subsequently acquired by the Banco Kentucky Company.

During 1929 and 1930, the bank, with the full knowledge and approval of its nonofficer, as well as of its officer, directors, made loans, aggregating about $4,000,000.00, on collateral consisting of stock in the Banco Kentucky Company, on which loans the plaintiff claims, and, as I am satisfied from the evidence and find, proved, a loss to the bank in the amount of $1,733,001.21, already mentioned. The master, although not making any findings of fact inconsistent with the findings of this court just stated, held that, on these facts, the plaintiff had not shown such a connection or relation between the bank and the Banco Kentucky Company as to render the making of these loans on this collateral a violation of the statute in question. With this conclusion of the master I am unable to agree.

The statute prohibits every national bank from purchasing its own stock and from making loans on the security of the shares of its own capital stock. The purpose of the statute is obvious, and there are many reasons for this salutary prohibition. The law seeks to make the stockholders of a national bank personally liable to an amount equal to the amount of their capital stock holdings in the bank. It would defeat this protection given to depositors if the bank were permitted to purchase from its stockholders, and to own, its own stock. If the bank were the holder of its own stock when it failed, there would, to that extent, be no stockholders to be held liable.

For the same reason, national banks were prohibited from making loans on the security of their own stock as collateral. If the borrower failed to pay the loan and the bank were forced to take the stock so held as collateral, the same unfortunate result would occur as in a case where the bank had purchased its own stock. The statute prohibits a national bank from making a loan which may result in exposing it to that dangerous position. The loaning of money by a bank on its own stock as collateral is, in substance, similar and analogous to the making of a loan by an individual on the security of his own indorsement of the note of the borrower. The bank is owned by its stockholders, and, if its own stock be taken as security for a note of its debtor, such security really represents a fractional part of the bank itself. The vice of such a transaction will clearly appear from the following hypothetical case: Let it be assumed that a national bank loans all of its available funds to one individual and that such individual owns, and pledges as collateral to the loan, all of the capital stock of the bank, and then becomes unable to pay any part of such debt, so that the bank is compelled to resort to the collateral security, consisting of all of its own capital stock. Obviously, the security would be worthless, the bank would be forced to close its doors, and there would be no stockholders from whom an assessment could be collected.

The misfortune may not be so apparent, and, of course the result would not be so calamitous, if only one small loan were made and only a small amount of the capital stock were taken as collateral to that loan. The principle, however, remains the same. The misfortune is only a matter of degree. The statute was manifestly intended to prohibit and prevent the doing, in any degree, of this thing which is wrong in principle and harmful in results. Such being the purpose of the law, we should look through mere matters of

form and mere names and endeavor to determine whether or not the statute, construed in accordance with its true meaning and intent, has been violated.

Applying these principles to the situation here presented, the National Bank of Kentucky could not make loans to itself and could not make loans to any one else and take its own capital stock as collateral security for such loans. The directors of the National Bank of Kentucky caused to be organized this holding company, to which was given the suggestive name of Banco Kentucky Company, which was, indeed, intended to be, and was, in many important respects and in a very real sense, as the record abundantly shows, the National Bank of Kentucky Company. It owned, as already indicated, a substantial amount of the stock of the National Bank of Kentucky, which was, in fact, at the outset, its principal asset and at all times thereafter continued to be its most valuable single asset, so that it was forced to close its doors a few days after the closing of the bank. During the brief life of the Banco Kentucky Company, and while the bank could not loan money on its own stock as collateral, it made the loans now under consideration, in the aggregate amount already mentioned, and took, as collateral security to such loans, capital stock in Banco Kentucky Company, which was, in substance and effect, not only its own holding company, but also, at least in equity, its alter ego, so to speak.

Another consideration in this connection deserves mention. Congress evidently recognized that, if a bank took its own stock as collateral to its loans, not only was it analogous to the act of a lender in indorsing the note which he takes from his debtor, but it would also result that, if the loaning bank met with misfortunes outside of that particular loan and for reasons not connected with that loan and its assets thereby became impaired, because of its own financial condition the security accompanying this loan would depreciate in value. Every misfortune which came to the bank from any source would, to a certain extent and in a certain mathematical proportion, jeopardize this security consisting of its own stock. This consideration is equally applicable, in all respects, to the taking, as collateral, of stock of the company holding a substantial amount of the stock of the bank making the loan. It seems clear that every evil or danger attendant on the taking of the stock of the National Bank of Kentucky as security for a loan made by such bank is present, at least in some degree, if stock of Banco Kentucky Company be taken by this bank as such collateral. This statute does not deal with degrees. It does not prescribe one rule for small loans and another for large loans, nor distinguish between loans secured partly by stock in the loaning bank and partly by other collateral and loans secured only by such stock. The prohibition is absolute, and no stock in the bank can be taken by it as collateral. If, for example, this bank had made a loan and taken, as security therefor, collateral 60 per cent. of which was sound stock in a successful manufacturing corporation and 40 per cent. was its own stock, it would seem plain that such a loan was in violation of this statute. What substantial difference is there in fact if, instead of taking collateral in the manner just indicated, the bank makes a loan and takes, as collateral thereon, stock in the Banco Kentucky Company and 60 per cent. of the assets of that company are of a kind which the bank could properly accept as collateral but 40 per cent. of such assets consist of stock of the bank itself, which the bank cannot take as collateral to a loan? It seems plain that the one is as much a violation of the real meaning and purpose of this statute as is the other.

Under the circumstances here presented, and in view of the evident intent and meaning of this statute, I am of the opinion that the capital stock of Banco Kentucky Company, so organized and with its assets invested to such a subtantial extent in the capital stock of the National Bank of Kentucky, stood in such a relation to this bank that the making by such bank of loans on which stock in that company was taken as collateral security was in violation of the statute in question. Any other construction or application of the statute would subordinate substance to form and would permit the obvious spirit, purpose, and intent of the statute to be defeated. Congress could not have intended such a result. When Congress declared, through this statute, that a national bank should not "make any loan or discount on the security of the shares of its own capital stock," it must have intended to prohibit the taking, as collateral, of the stock of any corporation a substantial portion of whose assets consisted of the stock of the bank making such loan. Every misfortune sought to be prevented by this statute is present under the facts presented in the case at bar. These misfortunes are the same whether the collateral be stock in the bank making the loan or stock in a corporation owning a substantial amount

of the stock of such bank, especially where, as here, such stock represents a substantial part of the assets of such corporation. It is the duty of courts, in interpreting a statute, to gather from the four corners of such statute its real purpose and meaning, rather than to construe the statute narrowly and to adopt an interpretation of it which will defeat what clearly appear to be the ends sought by the framers of such statute.

Aside, however, from any question as to the purpose of the statute, an examination of its very language leads, in my opinion, to the same conclusion. It will be noted that the statute does not, in terms, merely prohibit the taking by a national bank of its own capital stock as collateral to loans made by such bank. It expressly declares that no such bank "shall make any loan" on such security. So that in such a case not merely the security, but the loan itself, is illegal. Nor does the statute apply only to security consisting of the certificates of stock of a national bank. Indeed, it makes no reference to certificates of stock but, in broad language, prohibits the making of loans by a national bank "on the security of the shares of its own capital stock." The "shares" of stock are, of course, intangible and consist of the stock itself and not of the physical certificates merely evidencing ownership of such shares of stock. Furthermore, this language indicates that such a loan cannot be made either wholly or substantially on the security of such shares of stock. The very words of this statute make it clear that Congress was aiming at the substance, and not at merely the form or name, of the transaction thereby forbidden.

A homely illustration may be helpful in this connection. Let it be assumed that warehouse receipts for grapefruit are frequently accepted, as security for loans, by national banks, that the perishable character of grapefruit makes it of doubtful value as security, and that, because of this situation, Congress has enacted that no national bank shall make any loan on the security of grapefruit. Surely, under such circumstances, a national bank could not make a loan on collateral consisting of a warehouse receipt which covered a substantial quantity of grapefruit but which also included some oranges. Nor could it knowingly make a loan on that warehouse receipt merely because it described the security as a box of citrous fruits, if a substantial portion of such citrous fruit were grapefruit.

Now, in connection with this statute, the collateral under consideration is not grapefruit, citrous fruit, or boxes which contain citrous fruit, but consists of the shares of the capital stock of a national bank. The corporation known as Banco Kentucky Company, as applied to the illustration just discussed, is the box which holds the shares of the capital stock of the bank and the shares of the capital stock of other banks and institutions. When the National Bank of Kentucky took as security an interest in the Banco Kentucky Company, it was making a loan on the security of shares of its own capital stock just as truly as the hypothetical bank which loaned on warehouse receipts for a certain number of boxes of citrous fruit of which grapefruit formed a substantial percentage, was loaning on the security of grapefruit. The National Bank of Kentucky could not make a loan on the security of the shares of its own capital stock. Was it not, in substance and in fact, making a loan on that very security when it accepted as collateral security to a loan, shares of stock in what was virtually its holding company, Banco Kentucky Company? What value was there to these shares of the Banco Kentucky Company? What security did such shares afford? The answers to these questions are dependent largely on the value of the shares of the capital stock of the National Bank of Kentucky. In view of all of these facts and circumstances, of the purpose of the statute, and of the language thereof, it is, in my opinion, clear that in making loans on this collateral the bank was, in truth and in fact, making loans on the security of the shares of its own capital stock, in violation of this statute.

The evidence leaves no room to doubt, and none of the defendants denies, that all of the directors, with the exception of the two incompetent directors already mentioned, serving as such at the time, had full knowledge of the relations between the bank and the Banco Kentucky Company and knew and approved the making of loans by the bank, in amounts aggregating several million dollars, on the security of stock in the Banco Kentucky Company, and I so find. The master did not find to the contrary. Nor is there any claim or finding by the master that any such director did not knowingly approve the making of all of the particular loans made while he was a director and remaining unpaid at the close of the bank. It was therefore obviously unnecessary for the plaintiff to establish actual knowledge and approval by such directors of each separate specific loan comprising the total so remaining due and unpaid. It is plain, and I find, that each of the directors who was such when any of these

last-mentioned loans were made knowingly assented to the making of such loan, in violation of the statute involved, and is liable herein for the resultant loss to the bank, in the aforesaid sum of $1,733,001.29. For the reasons hereinbefore stated in connection with other transactions, the amount of damages recoverable from each director so liable will be determined, on stipulation or on settlement of the decree, in accordance with the rules already pointed out.

### Caldwell & Co.

From time to time in 1929 and 1930, the bank loaned large sums to Caldwell & Co., a Tennessee corporation engaged in the purchase and sale of investment securities, with its principal office at Nashville, Tenn., and with branch offices in various cities in the south and east, to Rogers Caldwell, J. D. Carter, and J. D. Heitzeberg, officers of such company, and to the Bank of Tennessee, the Associated Life Companies, Inc., and Southern Banks, Inc., wholly owned or controlled subsidiaries or agencies of Caldwell & Co., the unpaid balance of which loans at the time of the closing of the bank aggregated $1,650,-000. All of these loans were in fact made for the accommodation and benefit of Caldwell & Co. It is claimed by the plaintiff that in approving these loans the defendant nonofficer directors were not only guilty of violation of the statute limiting the obligations of a single debtor of the bank to 10 per cent. of its unimpaired capital and surplus, but were also guilty of negligence in approving such loans.

Although the master found, on sufficient basis in the evidence, that "all the foregoing companies were owned in their substantial entirety, if not altogether, by Caldwell & Co. and were merely legal agencies created by it for carrying on its manifold enterprises, and that the indebtedness of these concerns should be grouped together in determining the question as to the excess character of the loans mentioned," he also found, on equally sufficient basis, that the nonofficer directors had no knowledge of the relation between these nominally separate and distinct loans and debtors, and that they were therefore not liable under the said statute. I am not satisfied that the presumptive correctness of this finding has been overthrown by the evidence, and such finding must, therefore be accepted and adopted by the court.

In considering the question whether the nonofficer directors failed to exercise reasonable care in approving these loans, the master found that, in connection with the approval, on November 12, 1930, of three of such loans, hereinafter mentioned, the directors were negligent, and therefore liable for the resulting damages, amounting to $199,500. With that exception, the master found that the plaintiff had not established any actionable negligence on the part of these directors. The evidence shows that Caldwell & Co. was generally recognized as the outstanding investment banking house of the South; that the directors believed, and had reason to believe, that it had a net worth of at least $9,000,000 in excess of its liabilities, as it had represented, to their knowledge, in connection with the sale of one-half of its capital stock to the Banco Kentucky Company; that these directors were relying largely upon the officers of the bank who were in closer and more constant contact than they themselves could be with the details of these loans, with the character and condition of the debtors, and with all of the surrounding facts and circumstances. In view of this evidence, and on consideration of all of the surrounding facts and circumstances then confronting the directors, I am satisfied that the court would not be warranted, on this record, in setting aside the findings of the master to the effect that. no negligence of the directors in approving these loans has been sufficiently established.

The master, however, in my opinion, manifestly reached an incorrect conclusion in holding the nonofficer directors liable, to the extent already mentioned, by reason of their approval of three loans made by the officers, on September 6, 1930, one to Caldwell & Co., one to the Bank of Tennessee, and one to the Associated Life Companies, Inc., each for $100,000. The basis of this conclusion of the master is not clear. Apparently, however, the ground on which he found such liability was that the collateral securing these particular loans was insufficient and that the directors had been put upon inquiry as to the sufficiency of such collateral, but had failed to make such inquiry. As I understand the language of the master's report, he did not find that any of the said loans required collateral security, but merely that the collateral by which they were actually secured was insufficient, and that this would have been learned by the directors if they had made proper investigation. Obviously, however, as was pointed out by Judge Denison, in disposing of an interlocutory motion during these proceedings, "there was no duty to take good collateral if no collateral was necessary." As already noted, the master himself recognized and approved this rule in dealing with the loans

claimed to have been improvidently made because insufficiently secured by stock in the Banco Kentucky Company, saying, in that connection, that "in order to establish negligence in taking an improvident note, two things must be proved: (1) The financial insufficiency of the maker; also (2) lack of worth in the collateral if the note is secured by collateral. Both these things must be established before it can be said to be proved that any given note is improvident." There is therefore no occasion to determine whether the evidence supports the master's finding relative to the sufficiency of this collateral or as to the negligence of the directors in regard thereto. The conclusion of the master holding the directors liable for the loss on these three loans cannot be sustained. His conclusions concerning the other loans to Caldwell & Co. and to its affiliates, already discussed, must be affirmed.

### Herald-Post Company.

The plaintiff seeks to recover damages in the sum of approximately $310,000 representing the unpaid balance of the indebtedness owed to the bank by the Herald-Post Company, a corporation which owned the Herald-Post, a Louisville daily newspaper, and of which the defendant Brown, president of the bank, was the president and principal stockholder. $300,000 of this indebtedness was the amount remaining due on a loan evidenced by an unsecured demand note for $395,000 executed in 1927 by the Herald-Post Company and by the said Brown, as comaker, and the balance consisted of the amount of an overdraft in the commercial account of that company with the bank occurring during the last month before the closing of the bank.

The master found that none of the defendants except Brown was shown to have been negligent in making, approving, or carrying this loan. Among other things, the master found (pages 231 and 235 of his report) as follows:

"It did turn out after the bank suspended that Brown was largely involved. The proof, however, abundantly shows that this all became known after the suspension of the bank. It was generally thought in financial circles in Louisville, as testified to by all the directors, that Brown was a very wealthy man, his estimated financial worth ranging from five to twelve million dollars. * * *

"It cannot be overlooked that Mr. Brown was not only the president of the National Bank of Kentucky and owner of the Herald-Post, which was a high-class metropolitan newspaper, but was a director of the Standard Oil Company of Kentucky, of the Louisville & Nashville Railroad Company, of the Southern Bell Telephone Company, of the Louisville Gas & Electric Company, and of the American Turf Association.

"It is hardly conceivable that any bank director successfully could be charged with negligence in taking or carrying the note now under consideration. * * *

"It is true the directors might have examined the list of overdrafts supposed to have been read to the board and each of them might have examined the reports of the National Bank Examiners and of Humphrey Robinson & Company on the subject. According to long-established custom these reports were read to the board by Mr. Brown and discussed and analyzed by him. It is plain the contents of these reports were fraudulently concealed from the directors in so far as the debts mentioned herein, and others, are concerned. I do not think the ordinarily prudent business man, after being present when these reports were so read by the president of the bank, would have felt called upon in the exercise of due care to make a personal study and examination of each of these reports. There were more than forty members of the board during nearly all of the five last years before the suspension of the bank. If each member of the board had taken the precaution to read and study each report, the bank having only one copy, such course would have called for the consumption of much more time and labor than ordinary prudence would require. * * *

"Under all the circumstances it seems to me that there is no basis for the contention that the directors were negligent, either in approving or in carrying the $395,000 loan referred to."

These findings were supported by substantial evidence and are adopted by the court.

As I understand the report of the master, he has not expressly, or at least clearly, made any specific finding as to the knowledge or negligence of the defendant directors relative to the said overdraft, although he disallowed any recovery against them thereon. I discover no evidence in the record indicating knowledge of such overdraft, or negligence in connection therewith, on the part of any of these directors, or justifying rejection of the master's findings or conclusions relative thereto, which are accordingly affirmed.

954

## J. Matt Chilton.

The plaintiff claims, and the master held, that the nonofficer directors were negligent, in June, 1930, in failing to then insist on payment of, or on foreclosure sale of the collateral securing, the indebtedness owed to the bank on a demand note by J. Matt Chilton, a resident of Louisville, and that such directors are therefore liable for the loss caused thereby, amounting to approximately $300,000, together with interest thereon. Between March 28, 1928, and February 20, 1929, this debtor borrowed from the bank various sums aggregating $550,000 on demand notes secured by collateral consisting, in all, of 24,429 shares of the common stock of the American Turf Association. These loans were carried by the bank until the time of its closing, as was also the said collateral, and during all of that time the interest due thereon was regularly paid, except that the interest due on June 30, 1930, was not paid until August 6, 1930, and the interest falling due on September 30, 1930, was never paid. It does not, however, appear that any of the nonofficer directors knew of this delay or default in the payment of such interest. Up to and including June 15, 1930, the market value of this collateral was, with the exception of a few days, at all times in excess of the amount of the indebtedness secured thereby. During the five months between that date and the closing of the bank, such market value, based on market quotations, was less than such indebtedness, although the actual value of such collateral during that period was not shown. The master first found, on amply sufficient evidence, as follows (pages 238-242 of his report):

"The simple question presented is whether the directors were guilty of negligence in not collecting these debts between the time the loans were made and the closing of the bank.

"The only collateral on the notes was American Turf Association common stock. This stock was not a listed stock. It is said that the character of this company's business was such that it could not be listed. Just what is meant by this is not disclosed. The company was regularly incorporated and was engaged in a business authorized by law. There were, however, no regular market quotations on the stock. The quotations were gotten from brokers' offices and published in the newspapers. Mr. Brown, president of the bank, was a member of the board of directors and of the finance committee. The company owned quite a number of racing plants, consisting of tracks, grand stands, club houses, and all necessary race track equipment and accessories, situated at Louisville, Lexington, Cincinnati, and Chicago. * * *

"On February 19, 1929, when the last loan was made, the total indebtedness, including said last loan, was $550,000 while the collateral, according to market quotations of that date, was worth $853,818.25. * * *

"On June 15, 1930, the collateral and the indebtedness were practically the same. From that time, June 15, 1930, to the close of the bank there was apparently a continuous decline in the market, although all the quotations for that period are not given. When the bank closed the market value of the collateral was only $249,290. The practical question which confronted the directors June 15, 1930, the last day when the collateral was worth the debt, was whether they should then sell the collateral and collect the whole of the bank's indebtedness or should continue to carry the indebtedness. The answer to this would have been easy if the directors had known that Mr. Chilton had no surplus assets and that the collection of the bank's debts depended altogether on the future of American Turf Association stock. It was generally thought in financial circles in and around Louisville that Mr. Chilton was worth two or three million dollars. * * *

"The mere fact that the value of the collateral was slightly under the face of the notes need not have occasioned any great concern with a debtor of the supposed financial worth of Mr. Chilton. The collateral had been worth less than the debt in January, 1930, and in February, 1930; during the next two months, March and April, 1930, it had risen in value until there was a margin of $125,000. The policy of the bank in dealing with a debtor of Mr. Chilton's supposed wealth had to be taken into consideration. According to the evidence the collateral could not be called a purely speculative stock. Mr. Carroll states that it was thought that the American Turf Association could liquidate at par, that is, at $25 per share, at the time of its organization in 1927. He was the attorney for the Kentucky Jockey Club, one of the subsidiaries of the American Turf Association. The latter owned Churchill Downs, the Latonia tracks, the Lincoln Field Jockey Club, as well as the Washington Park Jockey Club at Chicago, and had a substantial interest in Hawthorne Park. The physical properties of the company were thought to be worth in excess of $12,000,000. The loan committee, consisting of eight members, who were thought to be

among the most capable financiers in Louisville and thoroughly acquainted with the situation, approved the carrying of the loans.

"It is very difficult to determine what should have been the course of the directors in this particular situation. It is easy to charge them with neglect with respect to these loans. How do ordinarily prudent directors act with respect to such matters? They were not confronted with a request for a loan. The situation is different from that. It was a question of continuing to carry a loan when the loan committee, aided by the credit department, was making no complaint about it. The future course of the market was unknown. The directors were walking in the dark. They were in the wake of a great panic. Even now we do not know but that in a short while this stock, which is still held by Mr. Keyes, will recover sufficiently to pay the entire indebtedness. * * *

"The question here is not how an ordinarily prudent man would act under normal circumstances, but how he would act in times when a world-wide readjustment of values was taking place without anyone knowing then that this was really happening. It seems to me that his position was something like that of one acting in an emergency. I feel that the matter addressed itself largely to the sound judgment of the directors."

After thus clearly stating the applicable considerations and applying them to the situation here presented, the master, without any findings to the effect that any of the nonofficer directors were informed, or aware, at any time, of the decline in the market quotations, or of the delinquencies in the payment of interest, already mentioned, then proceeded to hold that such directors were guilty of negligence, the substance of such conclusion being expressed by him (on page 243 of the report) as follows:

"However, there is one entirely safe course which the directors could have pursued. They could have had Mr. Chilton to furnish a financial statement when the stock was still worth the amount of the debt. Its continued decline clearly warranted this—in fact demanded it. * * *

"Mr. Chilton, about a month after the failure of the bank, called on the agents of the Receiver engaged in liquidating the bank and notified them that they would have to make the debt out of the collateral. This conversation was equivalent to a confession of insolvency at that time but no witness stated that Mr. Chilton was insolvent prior to that time.

There is, however, one clear indication of this, namely, his failure to pay promptly the instalment of interest due in June, 1930."

In view of the lack of evidence showing any knowledge on the part of any of these nonofficer directors concerning the matters just mentioned, and of the surrounding facts and circumstances specifically found and pointed out by the master in the portions of his report hereinbefore quoted, it is, in my opinion, clear that, even assuming (as is by no means apparent) that the value of this unlisted collateral is to be measured by its market quotations, and also that the 5½ weeks' delay, in the summer, and the 6½ weeks' delay, immediately preceding the close of the bank, in the payment of the aforesaid interest, indicated insolvency of the debtor, the ultimate conclusions of the master last quoted are without any basis in the evidence, are clearly erroneous, and are, indeed, inconsistent with his own specific findings. That conclusion, therefore, must be set aside, and no recovery will be awarded against any of the nonofficer directors in connection with the indebtedness of this debtor.

### James R. Duffin.

The directors are charged by the plaintiff with negligence in approving the loan of $12,500 made by the bank to James R. Duffin on his unsecured promissory note dated December 26, 1928, which remained unpaid at the time of the close of the bank. This debtor was a resident of Louisville who, just prior to the making of this loan, spent several months in France on behalf of the bank in making efforts to consummate a deal for the sale by the bank to the French public of an issue of securities representing the ownership of the Kentucky Wagon Company, which the bank was then operating, as already described. It it apparent that the debtor had devoted a large amount of time and services to his efforts to effect this sale, which were of substantial value, and, if successful, would have resulted in great financial benefit, to the bank. The master found that no negligence had been shown in connection with the making or approval of this loan, and I discover no evidence which would support any different finding. The conclusion of the master disallowing this claim is affirmed.

### Reed & Reed.

This item, to which the master and counsel have referred as the Reed & Reed item, consists of loans made by the officers of the bank, and approved by the nonofficer directors, to Reed & Reed, a partnership en-

956

gaged in the insurance business in Louisville, and to Stanley R. Reed, a member of such partnership, on which there was an unpaid balance, at the time of the closing of the bank, aggregating approximately $45,000 due from the firm and about $33,000 due from the said member of such firm. The plaintiff claims that the nonofficer directors are liable for the loss arising from the making of these loans, in the amounts just mentioned, on the ground that in approving and carrying such loans they failed to exercise proper care. The master found that such directors were negligent in approving four loans, in the total amount of $18,200, on various dates in 1930, but that they were not otherwise negligent or liable.

I do not find any evidence in the record tending to indicate any negligence on the part of these directors in approving any of these loans. It appears that, as was found by the master (page 251 of the report), "The firm owned the sole agency of an old line life insurance company for which it paid $50,000"; that "the possibility of profits from this source, the agency being owned by young, vigorous, energetic men experienced in the business of life insurance, was such that it should be considered in determining the credit situation of the parties owning it"; and that "the loan committee had approved the indebtedness as it stood and they were, of course, better acquainted with the credit situation of the parties owing these debts than the board of directors. At least they were supposed to have given more time to the consideration of that matter than the board of directors could possibly give." There is a total lack of evidence constituting any basis for the finding of the master that these directors were guilty of negligence in approving the loans made to this firm in 1930, which finding, in the absence of such evidence, is obviously incorrect and inconsistent with the findings of the master, in connection with loans to other debtors already considered, relative to the right of such directors to rely, until specifically warned to the contrary, upon the recommendations of the members of the loan committee to whom the investigation of the details of such loans and debtors had been intrusted. There being no evidence to indicate that the attention of these directors had been challenged to any circumstances amounting to a warning against their approving the acts of the officers in making these loans, and no other evidence of negligence in approving such acts appearing, the court cannot sustain the master's conclusion in question, and no recovery will be awarded against the nonofficer directors in connection with this item.

### Knadler & Lucas Company.

On March 16, 1926, Knadler & Lucas, Inc., a corporation engaged in the manufacture and sale of pickles and similar products in Louisville, became bankrupt, owing the bank $156,527.53 on loans theretofore made to it by the bank. In May, 1927, through the efforts of the bank, a newly organized corporation, the Knadler & Lucas Company, a Delaware corporation, in which the bank had induced one McNeal, a man familiar with this type of business, and the aforesaid Duffin, to become financially interested, acquired the assets of Knadler & Lucas, Inc., and assumed the indebtedness of the latter to the bank, executing its own notes to the bank, secured by a first mortgage on all of its assets, and by certain collateral pledged as additional security. As a part of the same transaction, the bank agreed to loan $40,000 in cash to the new company in order to furnish it with the necessary working capital to enable it to continue to operate the business previously conducted by its predecessor. Thereafter the bank loaned to the Knadler & Lucas Company $40,000 in 1927, $22,225 in 1928, $20,000 in 1929, and $18,000 in 1930, a total of $100,225, and between June 30, 1930, and the close of the bank it permitted the said company to overdraw its account to the extent of $22,165.10. During all of that period this debtor continued to pay to the bank interest on the old indebtedness so assumed by it and also on the loans made to it, but paid no part of the principal of such indebtedness or loans.

The master found that the evidence did not show that any of the nonofficer directors were negligent with respect to any of these matters. The substance of his findings and conclusions was expressed by him as follows (pages 256, 260–262 of the report):

"This suit having been begun on March 30, 1931, any cause of action against the directors who approved the loans to the old company was at that time barred by limitation in as much as the loans were all made prior to March 30, 1926. The only question to be determined here, as I see it, is whether the directors were negligent in connection with furnishing the money which was advanced to the new company in an effort to work out the old debt. * * *

"Briefly stated, the matter comes to this. The old company was adjudged a bankrupt in March, 1926. It owed the bank $156,527.-53. The bank wanted to save its debt. It

made an arrangement in May, 1927, by which McNeal, who had large experience in that line of business, took charge of the company. A mortgage was given to secure the company's debt which the new company assumed when it took over the assets from the trustee in bankruptcy. In addition to this, McNeal pledged $70,000 of notes secured by lien on real estate worth about $40,000. McNeal and Duffin also became bound personally for the old debt and executed notes for all new money advanced. The bank advanced new money as above stated. * * *

"When the directors approved the loans to the new company, it was thought that these loans had the approval of the loan committee. It turns out now that they did not. The personal worth of McNeal and Duffin also enter into the matter as well as the supposed approval of the loan committee. It seems to me that it was largely a matter of judgment to be exercised by the directors as to how long and to what extent new money should be advanced for the purpose of saving an old debt. It appeared to them that the loan committee, supposedly familiar with the circumstances, including the personal worth of the sureties on the notes and the value of the thirty-nine pieces of land in lien, had approved the loans. * * * The approval of these advances was a matter which addressed itself to the sound judgment of the directors, who I think acted according to their best judgment with the light they had. In the absence of any showing as to personal inattention or neglect on the part of the directors with respect to this matter, I do not think it should be said that they were guilty of negligence in approving advances."

These findings were fully supported by the evidence and must be sustained. I am satisfied by the record, and I find that the plaintiff has not met the burden of proving any negligence on the part of any of the nonofficer directors in connection with any of the indebtedness of this debtor, and that he is not entitled to any recovery against them with respect thereto.

Industrial Ownership Corporation.

The plaintiff alleges negligence and resulting liability on the part of the directors arising from their claimed improvident failure to direct a sale by the bank, earlier than such sale was made, of a substantial amount of stock in the Van Camp Packing Company which was delivered to the bank by Industrial Ownership Corporation as collateral security on certain notes executed by it to the bank; it being charged by the plaintiff that such negligence on their part was responsible for a loss to the bank in the sum of approximately $66,000, consisting of the difference between the price obtained for such stock when it was finally sold and the price which would have been realized if it had been seasonably sold.

The master found that no knowledge by the nonofficer directors of these loans or of this collateral had been established by the evidence, and I am satisfied that the record sufficiently supports this finding. The master found in substance as follows (pages 269–273 of the report):

"It is important to determine whether the directors ever, at any time, knew that the bank held the Industrial Ownership Corporation's notes above referred to or the stock pledged thereon. The defendants state that they never heard of these notes or this collateral. * * *

"The by-laws and regulations of the bank with respect to submitting all loans to the board of directors have been discussed heretofore under the Murray Rubber Company subdivision, page 120 hereof. It is not necessary to report this discussion here. I think the officers never presented the Industrial Ownership notes to the directors. They never appeared on the $50,000 and over book and I am sure were never on the weekly loan lists. This is the reason none of the nonofficer directors ever heard of this indebtedness. In as much as all loans made by the bank were required to be submitted to the directors, regardless of whether the officers called them investments or something else, I do not think the directors, in the absence of anything to call their attention especially to the matter, were under obligation to look elsewhere than on the loan list and the $50,000 and over book for loans. * * *

"There are certain other features about the bank's holding this stock that arouse suspicion or apprehension. The weakness of President Brown for Van Camp Company stock runs through this entire record. He was undoubtedly speculating in this stock. His attachment for it is unexplained. The books of Wakefield & Co. indicate that he was constantly dealing in it. The Industrial Ownership Corporation was a holding company for the Van Camp Packing Company stock. * * *

"One cannot but suspect that Brown had some personal interest in this stock, and the concealment from the nonofficer directors of the ownership of this stock by the bank is thus to be accounted for."

As these findings have ample basis in the evidence, they must be adopted by the court. It results that no damages sustained by the bank from this transaction will be awarded against any of the nonofficer directors.

### Alleged Illegal Dividends.

During the last three years of the operation of the bank dividends were declared and paid on its capital stock at the rate of $160,000 each quarter. It is contended by the plaintiff that the payment of each of these dividends between June 10, 1927, and the closing of the bank, November 16, 1930, aggregating $2,240,000, was contrary to the provisions of sections 56 and 60 of title 12 of the United States Code (12 USCA §§ 56, 60), and that in declaring such dividends the directors knowingly violated said statutory provisions and therefore are liable for the amount thereof, under section 93 of title 12 of the United States Code (12 USCA § 93), already mentioned, providing that any director of a national bank who shall knowingly violate or permit to be violated any of the provisions of the national banking statutes "shall be held liable in his personal and individual capacity for all damages" thereby caused such bank. Section 60 just cited (section 5199 of the United States Revised Statutes) is as follows:

"The directors of any association may, semiannually, declare a dividend of so much of the net profits of the association as they shall judge expedient; but each association shall, before the declaration of a dividend, carry one-tenth part of its net profits of the preceding half year to its surplus fund until the same shall amount to 20 per centum of its capital stock."

Section 56 of said title (section 5204 of the Revised Statutes) contains the following provisions:

"No association, or any member thereof, shall, during the time it shall continue its banking operations, withdraw, or permit to be withdrawn, either in the form of dividends or otherwise, any portion of its capital. If losses have at any time been sustained by any such association, equal to or exceeding its undivided profits then on hand, no dividend shall be made; and no dividend shall ever be made by any association, while it continues its banking operations, to an amount greater than its net profits then on hand, deducting therefrom its losses and bad debts. All debts due to any associations, on which interest is past due and unpaid for a period of six months, unless the same are well secured, and

in process of collection, shall be considered bad debts within the meaning of this section."

The master disallowed this claim in its entirety, finding that the evidence failed to show any facts indicating any statutory violation by any of the directors or any negligence on their part in connection with these dividends. The master discussed and analyzed, at great length and in much detail, numerous debts which the plaintiff claims should have been charged off as statutory bad debts, and after painstaking and thorough consideration of such debts and of the other relevant facts and circumstances the master found that the evidence did not sustain this claim of the plaintiff. To recite or review these details would unduly prolong this opinion and would serve no useful purpose. It is sufficient to say that the findings of the master are convincingly supported by the record. It is entirely clear, and I find, that the witnesses on whom the plaintiff relied in this connection had no personal knowledge of the facts concerning which they assumed to testify. There is no competent evidence sufficient to sustain the burden resting on the plaintiff of proving that any of these dividends were paid out of capital of the bank or were not paid out of its net profits after deducting therefrom its losses and bad debts, including all debts on which interest was past due and unpaid for a period of six months and which were not well secured and all debts in process of collection. It appearing that the findings of the master are supported by the record, such findings are affirmed, and no recovery against these directors by reason of the declaration or payment of these dividends will be awarded.

### Interest.

In this suit in equity and for the recovery of unliquidated damages, the extent to which interest should be allowed is a matter within the sound discretion of the court. Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed. 265; Concordia Insurance Co. v. School District, 282 U. S. 545, 51 S. Ct. 275, 75 L. Ed. 528; Federal Surety Co. v. A. Bentley & Sons Co., 51 F.(2d) 24, 78 A. L. R. 1041 (C. C. A. 6).

In view of the fact that no misconduct or bad faith on the part of any of the nonofficer directors has been shown and as it does not appear that any demand for the payment of any damages was made on the directors prior to the commencement of this suit and it being uncertain on the record as to when the amount of the damages recoverable herein became definitely ascertainable and on consideration of the entire situation presented, I reach the

conclusion that interest on such damages, as determined by the decree, should be computed from the date of the commencement of this suit, March 30, 1931. Such interest will be at the rate of 6 per cent. per annum, the legal rate prescribed by the law of the state, Kentucky, in which the court is sitting. Federal Surety Co. v. A. Bentley & Sons Co., supra.

Except as hereinbefore otherwise indicated, the report of the master will be confirmed.

A decree in conformity with the terms of this opinion may be presented for settlement, pursuant to the applicable practice, at which time the question as to the allowance of costs and any other question not already adjudicated will be determined.