## ANDERSON v. AKERS et al.
### No. 649.

District Court, W. D. Kentucky.
Dec. 19, 1934.

Locke, Locke, Stroud & Randolph, of Dallas, Tex., and Peter, Lee, Tabb, Krieger & Heyburn, of Louisville, Ky., for plaintiff.

Henry E. McElwain, Jr., Thomas A. Barker, John C. Doolan, William W. Crawford, Allen P. Dodd, A. C. Van Winkle, Graddy Cary, Henry J. Tilford, H. H. Nettelroth, John J. Davis, Hugh B. Fleece, J. Wheeler Campbell, T. Kennedy Helm, Churchill Humphrey, Frederic M. Sackett, all of Louisville, Ky., and Newton D. Baker and Howard F. Burns, both of Cleveland, Ohio, for defendants.

TUTTLE, District Judge.

Since the filing of the opinion of the court herein (7 F. Supp. 924), the defendants have filed a petition for rehearing, with respect to certain of the matters involved, on various grounds which have been argued in supplemental briefs and which have been carefully considered by the court. While some of these arguments are, perhaps, presented more fully and elaborately than heretofore, yet, in substance and effect, they appear to be, at least for the most part, repetitions of arguments already submitted and decided.

### General Considerations.

It is again urged by the defendants that the proofs fail to establish such knowing participation in, or assent to, the violation of the statutory provisions involved, as is a prerequisite to liability under such provisions, that these statutes are penal in nature, and therefore must be construed strictly against the plaintiff, and that the approval, express or tacit, by the Comptroller of the Currency or of national bank examiners representing him, of the transactions here in question, amounted to a construction of these statutes in such a way that, as so construed, they were not violated by the said transactions. Any extended discussion of these questions at this time is unnecessary, and would be largely a repetition of conclusions previously expressed. It is sufficient now to point out that (1) the knowledge necessary to render any particular conduct a violation of any of these statutes is knowledge of the facts constituting that conduct, and not knowledge that, as a matter of law, such conduct constitutes a violation of such statutes, so that the question of good

faith is not important (Corsicana National Bank v. Johnson, 251 U. S. at page 83, 40 S. Ct. 82, 88, 64 L. Ed. 141); (2) it is immaterial whether these statutes are, or are not, penal in character, because, even if they be so construed, they were, in my opinion, violated by the acts of the defendants involved; and (3) I do not find in the record facts indicating that the Comptroller, either expressly or by implication, ever construed any of those statutes so as to make them inapplicable to the transactions in question, assuming that such statutes have sufficient ambiguity to make evidence of such executive construction relevant to the question as to their proper interpretation by the court. A bank examiner has no such authority.

Passing to the contentions of the defendants relative to the conclusions of the court with respect to specific transactions, certain of such contentions may be briefly noted.

### Kentucky Wagon Manufacturing Company.

It is urged by the defendants that the conclusions of the court in connection with this subject are based upon a misapprehension by it as to the period of time during which the bank owned and operated the business of the Kentucky Wagon Manufacturing Company, a Delaware corporation, organized by the bank in 1924 for the purpose of acquiring the assets of the former Kentucky Wagon Manufacturing Company, a Kentucky corporation, which had become heavily indebted to the bank. It is argued by them that this period commenced in 1927, when the bank finally acquired title to the plant of the old wagon company, and not, as held by the court, in 1924, when the bank acquired the inventory and other personal property of the old company. Prior to 1924, the said company had sold its plant to National Motors Corporation, retaining, however, its other assets, so that it did not own this plant (although it occupied and used it) when, in 1924, the bank acquired all of the assets then owned by the old company, including its business as a going concern, which business the bank then proceeded to operate continuously for more than six years and up to the closing of the bank. It is clear from the record that, from 1924, when the bank organized the new company and, through it, acquired the assets then owned by the old company, and continuously thereafter, the bank, through its officers and directors, was acting pursuant to a definite plan which contemplated the acquisition and operation, through the instrumentality of the new company, of this wagon manufactur-

ing business and of all of the property used by the old company in its business, including the plant not then owned by it, pending a sale thereof by the bank. This was recognized by the special master, who, on page 33 of his report, said:

"It is apparent that the purpose of the bank in organizing the Delaware Company was to acquire title to the whole property through this new company; and the purpose of acquiring the whole property through one company was to enable the bank in this way to recoup its losses and save the debts owing to it by the Kentucky Company and the National Motors Corporation."

Indeed, counsel for the defendants in one of their recent briefs say:

"The plan for taking over the Wagon Company as a means of saving a heavy loss to the bank was developed under the advice and guidance of * * * Judge Alexander P. Humphrey. * * * In view of the absence, illness, and death of Judge Humphrey after his plan had been formulated and embarked upon, it would not be possible to claim reliance upon his supervision of the later details. But the fact is that the plan was devised by Judge Humphrey, that it involved the formation of the new corporation, the acquisition of the inventory and ultimately of the property, and its sale as a going concern. Every step knowingly taken by the directors, so far as the record discloses, was, therefore, obviously an attempt to follow out the advice of" this attorney.

While the bank did not obtain title to the plant until 1927, after it had been operating the business for more than three years, the period during which the bank was expending its money, in substantial amounts, in carrying on this wagon manufacturing business was, as indicated in the opinion, more than six years, and not, as defendants argue, less than three years.

Moreover, the essential vice in this transaction and what stamped it in its inception as ultra vires was the knowing and intentional participation of the officers and directors in this comprehensive unitary plan pursuant to which the incorporation of the new company and the acquisition and operation of this business were carried out. The speculative nature of this plan, the inevitable necessity of future substantial cash outlays therein, and the obvious uncertainty as to the salability of this business and as to the operating results thereof pending such a sale were facts which could not have been unknown to the participating and assenting of-

ficers and directors of the bank. It is therefore immaterial whether such officers and directors ever actually knew the exact amounts which were being so expended or precisely what losses in connection therewith were being sustained. Nor are they excused from liability by the facts that their purpose was to effect a resale of this property in order to recoup the previous losses of the bank in its dealings with the old wagon company, that efforts were made to consummate such a sale, and that the object of the operations was to make the property more readily and more advantageously salable.

It may be added that the damages for which defendants are here held liable are those which, as found by the special master, were sustained within five years prior to the commencement of this suit, and therefore not barred by the applicable statute of limitations, in the operation of this business, and do not include any sums spent merely for the purchase or reconditioning of this property, so as to make it fit for sale. Cooper v. Hill (C. C. A. 8) 94 F. 582, 586. The amount of these damages, if not stipulated, will be determined on settlement of the decree.

### Wakefield & Co.

█ The defendants urge, among other contentions, that not all of the amount of the indebtedness of Wakefield & Co. due and unpaid at the closing of the bank represented excessive loans within the meaning and scope of the statute prescribing the maximum amount of loans permitted to be made by a national bank, because, they argue, such indebtedness included loans not in excess of such maximum. As pointed out in the previous opinion (7 F. Supp. at page 938) only such loans to a debtor as cause or increase an excess of the indebtedness to that debtor beyond the statutory limit constitute excessive loans. The question as to the extent to which the indebtedness here involved represented loans which did, when made, cause or increase this limit, is a question to be determined on the settlement of the decree.

None of the other arguments now presented in connection with this transaction raise any question not already presented, considered, and determined, by conclusions to which I adhere.

### Murray Rubber Company.

█ The defendants have amplified their former argument to the effect that, in determining whether the loans of the bank to the Murray Rubber Company exceeded the statutory limit, the $330,000 of bearer bonds of that company held by the bank, as described in the previous opinion, should be excluded. It still seems clear, however, that, in view of the circumstances under which these bonds were acquired in 1922 by the bank, as already described (7 F. Supp. at page 944), they represented "money borrowed" by the Murray Rubber Company from the bank, within the meaning of the "excess loans" statute as it stood prior to 1927, and that, when this statute was, in 1927, broadened by amendment so as to include "obligations," such bonds, having been received by the bank as evidence of advances made by it to the rubber company, were "obligations" within the meaning of the amendatory statute.

█ Defendants invoke the provision in this statute, as so amended, providing that "the term 'obligations' shall mean the direct liability of the maker or acceptor of paper discounted with or sold to" a national bank "and the liability of the endorser, drawer, or guarantor who obtains a loan from or discounts paper with" such a bank. The defendants argue that a bond does not constitute "paper," within the meaning of this provision. The only authority cited in support of this argument is a dictionary definition of the word "paper" which defines such word as meaning "negotiable evidences of indebtedness, such as promissory notes, bills of exchange, etc.," and another dictionary definition of this word as meaning "written or printed pledges or promises to pay which are negotiable, as bank-bills, treasury-notes, bills of exchange, or drafts." It is obvious that neither of these definitions supports the argument thus made; the bearer bonds here involved being clearly "negotiable evidences of indebtedness" and "printed pledges or promises to pay which are negotiable." Not only does this contention require a strained and unnatural construction of the statute, but it would result in a complete removal of all of the statutory restrictions upon the amount of loans which a national bank may make to a single debtor and would permit such a bank to make such loans in any amount which it saw fit, through the simple expedient of taking a bond, instead of a note, from the debtor. It is evident that by this amendment Congress intended to further limit rather than to broaden the power of national banks to make loans to a single debtor, and I find nothing in the language, or in the manifest purpose, of such amendment which would justify the construction thus urged

by the defendants. Their contention cannot be sustained.

What has already been said relative to the good faith of the defendants and the claimed practical construction of these statutes by the Comptroller, as defenses in this suit, is equally applicable to this transaction, and need not be repeated in this connection.

The defendants now contend that the 1927 amendment (Act Feb. 25, 1927, § 2, 44 Stat. 1226) to the seventh subdivision of section 24 of title 12 of the United States Code (see 12 USCA § 24 (7), quoted in the original opinion herein, limiting the power of a national bank relative to "investment securities" (7 F. Supp. at page 943), does not affect the status of the bonds in question as it existed prior to the enactment of the amendment. It was, however, the defendants who invoked this amendment, in connection with the argument that these bonds represented an investment of the bank and therefore came within the scope of this amendment, which prescribes, as the maximum amount of "investment securities of any one obligor or maker" which may be held by a national bank, not 10 per cent., as prescribed by section 84 of said title (12 USCA § 84), here applicable, but 25 per cent., of the paid-in unimpaired capital stock of such bank, which maximum, if applicable to these bonds, was not exceeded by the holding of such bonds. If, however, the defendants do not now rely on this amendment, it is unnecessary to devote any further attention to it here.

The defendants present no other arguments with respect to the dealings of the bank with this debtor which have not been already advanced, considered, and disposed of, and there is no occasion to discuss this subject further at this time.

### E. B. Norman & Co.

■ The present arguments of the defendants with respect to the indebtedness of E. B. Norman & Co. to the bank involve two contentions. First, it is insisted that, to the extent that unpaid interest on a loan is added to the principal thereof in determining whether subsequent loans to the same debtor are excessive, it must appear that the directors alleged to be liable therefor knew, not only that such prior principal, but also that such interest thereon, was due and unpaid when such subsequent loans were made; and defendants insist that this rule is applicable to the indebtedness to the bank of this debtor. This contention as to the rule itself is, of course, sound. The plaintiff, however, claims, and the record, as I understand it,

shows, that no interest is included or considered in computing any part of this indebtedness, either before or after the statutory limit was exceeded. This question, however, will be determined when the amount of damages recoverable from each of the defendants is determined on settlement of the decree.

■ The further contention of the defendants to the effect that the mere approval, by a director, of the renewal of an excessive loan does not constitute a violation of the statute relating to excessive loans, has already been sustained by the court in its former opinion. The question as to whether any particular defendant approved the making of such a loan or approved only the renewal thereof is another question to be considered in connection with the settlement of the decree.

### BancoKentucky Company.

I have carefully examined all of the arguments now urged by the defendants with respect to this subject, but I do not find any contention which has not in substance, if not in form, already been presented, considered, and overruled in the previous opinion. Nor do I discover any reason to modify the conclusions there expressed in this connection.

Without resting my decision upon any single fact, but having in mind all of the circumstances surrounding the organization of the BancoKentucky Company and the making of the loans in question, including the facts that the directors of the bank organized and promoted said company and that at its inception more than half of the value of the assets of such company consisted of the value of stock in the bank, which at all times represented a substantial portion of such assets, and in view of the uncollectibility of these loans as unsecured loans, I am still of the opinion that the relations between the bank and the BancoKentucky Company were of such a nature, to the knowledge of the defendants, that the making of the said loans violated the statute forbidding the making by a national bank of loans on the security of its own stock.

As already pointed out in the opinion (7 F. Supp. at page 951), inasmuch as defendants who were directors at the time when these loans were made knew that substantial amounts were being loaned by the bank in connection with the issuance of the BancoKentucky Company stock and on the security thereof, and assented to the mak-

ing of such loans, they must be held chargeable with knowledge of each of the loans so made, and it is unnecessary for the plaintiff to prove such knowledge with respect to each particular loan separately.

The defendants cite, as in point, decisions holding that the taking, by a national bank, of stock in a corporation whose assets consist of real estate, is not a taking of real estate. These decisions, however, in my opinion, involve a situation differing substantially from that now presented, and are therefore not applicable here.

### Judgment Against Legal Representatives.

■ It is urged, by certain defendants who are sued only in their official capacity as the administrators or executors of deceased directors, duly appointed pursuant to the laws of Kentucky, that, by reason of a certain Kentucky statute, any decree against them herein should expressly provide that they are liable merely "for the amount of assets in their hands unadministered." Ky. St. § 3866. Plaintiff expresses its willingness that the decree against the defendants just mentioned should show that each of them is liable herein only in his official capacity and not as an individual, but plaintiff objects to any language in the decree "precluding the plaintiff from contesting, if the plaintiff deems expedient, the propriety of any distribution heretofore made" by any of such defendants. Plaintiff has suggested the insertion in the decree of a provision as follows:

"Each adjudication herein made against an executor or administrator is made against such defendant in his official capacity as such executor or administrator, and shall be deemed and shall constitute an adjudication of indebtedness solely on the part of his testator or intestate. The amount of such adjudication shall be collectible out of the assets of such testator or intestate, in such manner, and to such extent, as may be proper or permissible under the law of Kentucky."

■ I am satisfied that the language so suggested properly protects the rights of all parties concerned, and that it is fully in accordance with the substance of the Kentucky statute in question. The contention of the plaintiff in this connection is sustained. It seems, however, clear, and I do not understand that the plaintiff claims otherwise, that any proceedings contesting the propriety of any of the official actions of an officer of the state court by which he was appointed

must be taken in that court pursuant to the applicable law of such state.

### Settlement of Decree.

It has been, and still is, the understanding and intention of the court, with respect to both the former opinion and the present one, that, in giving effect to the general conclusions of the court and applying them to the various specific defendants and transactions, all questions as to the amount of damages recoverable herein against each individual defendant, in connection with each of the transactions involved, were and are reserved for determination in connection with the settlement of the decree. Those questions therefore are not adjudicated at the present time.

By a stipulation between the parties there has now been raised and submitted to the court the question whether the liability of the defendant Hieatt has been affected by his discharge in bankruptcy while this cause was pending. This, in my opinion, is one of the questions which should be determined when the extent of the liability herein of each of the defendants is determined on settlement of the decree. It seems to be the position of these parties that the effect of this discharge upon the suit here depends upon the provability in bankruptcy of such liability, it appearing, from the failure to argue otherwise, that the plaintiff concedes that, if so provable, this liability is dischargeable in bankruptcy and is not among the exceptions, such as that applicable to liabilities "for willful and malicious injuries to the person or property of another," specified in section 17 of the Bankruptcy Act (11 USCA § 35).

The plaintiff, but none of the defendants, has submitted a draft of a proposed decree. The last brief of the defendants contains the following language: "There are many inaccuracies in the decree presented by counsel, which must be discussed and determined in detail before the decree can be settled. Until the Court has passed upon the fundamental questions raised by the petition for rehearing, we shall not burden him with the mass of details necessary to a proper revision of the proposed decree." The defendants will now present a draft of their proposed decree and their briefs in connection therewith. In view of the large number of defendants and the mass of statistics and figures involved, the court feels that oral arguments would not be helpful and that it would prefer to have, and desires to have, carefully prepared briefs, citing the pages

of the record supporting the claims and arguments which are in dispute. This applies to the plaintiff as well as to the defendants. While the statements made in the former opinion as to specific sums for which various defendants are liable were based on the understanding by the court of the record, and nothing has been suggested which alters such conclusions, yet, inasmuch as the briefs and arguments heretofore presented related primarily to questions of law and broad general questions of fact, rather than to the specific amounts for which each individual defendant is liable in connection with each specific transaction, it is assumed that the drafts of proposed decrees and the briefs in connection therewith will present and explain, in detail, the respective contentions of the parties as to the amounts of damages recoverable, on the basis of the general conclusions of the court already expressed. The court has not intended to definitely and finally determine, either in its former opinion or in this one, any of these specific details.

The petition for a rehearing must be denied, and an order will be entered accordingly.